ARTHUR ANDERSEN LLP *v.* UNITED STATES

No. 04–368.   Argued April 27, 2005—Decided May 31, 2005

REHNQUIST, C. J., delivered the opinion for a unanimous Court.

*Maureen E. Mahoney* argued the cause for petitioner. With her on the briefs were *Alexandra A. E. Shapiro, J. Scott Ballenger,* and *Charles A. Rothfeld.*

*Deputy Solicitor General Dreeben* argued the cause for the United States. With him on the brief were *Acting Solicitor General Clement, Acting Assistant Attorney General Keeney, Kannon K. Shanmugam, Sangita K. Rao, Andrew Weissmann,* and *Matthew W. Friedrich.*\*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

As Enron Corporation's financial difficulties became public in 2001, petitioner Arthur Andersen LLP, Enron's auditor, instructed its employees to destroy documents pursuant to its document retention policy. A jury found that this action made petitioner guilty of violating 18 U. S. C. §§ 1512(b)(2)(A) and (B). These sections make it a crime to "knowingly us[e] intimidation or physical force, threate[n], or corruptly persuad[e] another person . . . with intent to . . . cause" that person to "withhold" documents from, or "alter" documents for use in, an "official proceeding." [1] The Court of Appeals for the Fifth Circuit affirmed. We hold that the jury instructions failed to convey properly the elements of a "corrup[t] persua[sion]" conviction under § 1512(b), and therefore reverse.

Enron Corporation, during the 1990's, switched its business from operation of natural gas pipelines to an energy conglomerate, a move that was accompanied by aggressive accounting practices and rapid growth. Petitioner audited Enron's publicly filed financial statements and provided internal audit and consulting services to it. Petitioner's "en-

---

\*Briefs of *amici curiae* urging reversal were filed for the American Institute of Certified Public Accountants by *Kelly M. Hnatt* and *Richard I. Miller;* for the New York Council of Defense Lawyers by *Lewis J. Liman;* and for the Washington Legal Foundation et al. by *Carter G. Phillips, Virginia A. Seitz, Daniel J. Popeo,* and *Paul D. Kamenar.*

*Robert N. Weiner* and *Joshua L. Dratel* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae.*

[1] We refer to the 2000 version of the statute, which has since been amended by Congress.

gagement team" for Enron was headed by David Duncan. Beginning in 2000, Enron's financial performance began to suffer, and, as 2001 wore on, worsened.[2]  On August 14, 2001, Jeffrey Skilling, Enron's Chief Executive Officer (CEO), unexpectedly resigned.  Within days, Sherron Watkins, a senior accountant at Enron, warned Kenneth Lay, Enron's newly reappointed CEO, that Enron could "implode in a wave of accounting scandals."  Brief for United States 2.  She likewise informed Duncan and Michael Odom, one of petitioner's partners who had supervisory responsibility over Duncan, of the looming problems.

On August 28, an article in the Wall Street Journal suggested improprieties at Enron, and the SEC opened an informal investigation.  By early September, petitioner had formed an Enron "crisis-response" team, which included Nancy Temple, an in-house counsel.[3]  On October 8, petitioner retained outside counsel to represent it in any litigation that might arise from the Enron matter.  The next day, Temple discussed Enron with other in-house counsel.  Her notes from that meeting reflect that "some SEC investigation" is "highly probable."  *Id.*, at 3.

On October 10, Odom spoke at a general training meeting attended by 89 employees, including 10 from the Enron en-

---

[2] During this time, petitioner faced problems of its own.  In June 2001, petitioner entered into a settlement agreement with the Securities and Exchange Commission (SEC) related to its audit work of Waste Management, Inc.  As part of the settlement, petitioner paid a massive fine.  It also was censured and enjoined from committing further violations of the securities laws.  In July 2001, the SEC filed an amended complaint alleging improprieties by Sunbeam Corporation, and petitioner's lead partner on the Sunbeam audit was named.

[3] A key accounting problem involved Enron's use of "Raptors," which were special purpose entities used to engage in "off-balance-sheet" activities.  Petitioner's engagement team had allowed Enron to "aggregate" the Raptors for accounting purposes so that they reflected a positive return.  This was, in the words of petitioner's experts, a "black-and-white" violation of Generally Accepted Accounting Principles.  Brief for United States 2.

gagement team. Odom urged everyone to comply with the firm's document retention policy.[4] He added: "'[I]f it's destroyed in the course of [the] normal policy and litigation is filed the next day, that's great. . . . [W]e've followed our own policy, and whatever there was that might have been of interest to somebody is gone and irretrievable.'" 374 F. 3d 281, 286 (CA5 2004). On October 12, Temple entered the Enron matter into her computer, designating the "Type of Potential Claim" as "Professional Practice—Government/Regulatory Inv[estigation]." App. JA–127. Temple also e-mailed Odom, suggesting that he "'remin[d] the engagement team of our documentation and retention policy.'" Brief for United States 6.

On October 16, Enron announced its third quarter results. That release disclosed a $1.01 billion charge to earnings.[5] The following day, the SEC notified Enron by letter that it had opened an investigation in August and requested certain information and documents. On October 19, Enron forwarded a copy of that letter to petitioner.

---

[4] The firm's policy called for a single central engagement file, which "should contain only that information which is relevant to supporting our work." App. JA–45. The policy stated that, "[i]n cases of threatened litigation, . . . no related information will be destroyed." Id., at JA–44. It also separately provided that, if petitioner is "advised of litigation or subpoenas regarding a particular engagement, the related information should not be destroyed. See Policy Statement No. 780—Notification of Litigation." Id., at JA–65 (emphasis deleted). Policy Statement No. 780 set forth "notification" procedures for whenever "professional practice litigation against [petitioner] or any of its personnel has been commenced, has been threatened or is judged likely to occur, or when governmental or professional investigations that may involve [petitioner] or any of its personnel have been commenced or are judged likely." Id., at JA–29 to JA–30.

[5] The release characterized the charge to earnings as "non-recurring." Brief for United States 6, n. 4. Petitioner had expressed doubts about this characterization to Enron, but Enron refused to alter the release. Temple wrote an e-mail to Duncan that "suggested deleting some language that might suggest we have concluded the release is misleading." App. JA–95.

On the same day, Temple also sent an e-mail to a member of petitioner's internal team of accounting experts and attached a copy of the document policy. On October 20, the Enron crisis-response team held a conference call, during which Temple instructed everyone to "[m]ake sure to follow the [document] policy." Brief for United States 7 (brackets in original). On October 23, Enron CEO Lay declined to answer questions during a call with analysts because of "potential lawsuits, as well as the SEC inquiry." *Ibid.* After the call, Duncan met with other Andersen partners on the Enron engagement team and told them that they should ensure team members were complying with the document policy. Another meeting for all team members followed, during which Duncan distributed the policy and told everyone to comply. These, and other smaller meetings, were followed by substantial destruction of paper and electronic documents.

On October 26, one of petitioner's senior partners circulated a New York Times article discussing the SEC's response to Enron. His e-mail commented that "the problems are just beginning and we will be in the cross hairs. The marketplace is going to keep the pressure on this and is going to force the SEC to be tough." *Id.,* at 8. On October 30, the SEC opened a formal investigation and sent Enron a letter that requested accounting documents.

Throughout this time period, the document destruction continued, despite reservations by some of petitioner's managers.[6] On November 8, Enron announced that it would

---

[6] For example, on October 26, John Riley, another partner with petitioner, saw Duncan shredding documents and told him "this wouldn't be the best time in the world for you guys to be shredding a bunch of stuff." Brief for United States 9. On October 31, David Stulb, a forensics investigator for petitioner, met with Duncan. During the meeting, Duncan picked up a document with the words "smoking gun" written on it and began to destroy it, adding "we don't need this." *Ibid.* Stulb cautioned Duncan on the need to maintain documents and later informed Temple that Duncan needed advice on the document retention policy.

issue a comprehensive restatement of its earnings and assets. Also on November 8, the SEC served Enron and petitioner with subpoenas for records. On November 9, Duncan's secretary sent an e-mail that stated: "Per Dave— No more shredding. . . . We have been officially served for our documents." *Id.*, at 10. Enron filed for bankruptcy less than a month later. Duncan was fired and later pleaded guilty to witness tampering.

In March 2002, petitioner was indicted in the Southern District of Texas on one count of violating §§ 1512(b)(2)(A) and (B). The indictment alleged that, between October 10 and November 9, 2001, petitioner "did knowingly, intentionally and corruptly persuade . . . other persons, to wit: [petitioner's] employees, with intent to cause" them to withhold documents from, and alter documents for use in, "official proceedings, namely: regulatory and criminal proceedings and investigations." App. JA–139. A jury trial followed. When the case went to the jury, that body deliberated for seven days and then declared that it was deadlocked. The District Court delivered an *"Allen* charge," *Allen* v. *United States,* 164 U. S. 492 (1896), and, after three more days of deliberation, the jury returned a guilty verdict. The District Court denied petitioner's motion for a judgment of acquittal.

The Court of Appeals for the Fifth Circuit affirmed. 374 F. 3d, at 284. It held that the jury instructions properly conveyed the meaning of "corruptly persuades" and "official proceeding"; that the jury need not find any consciousness of wrongdoing; and that there was no reversible error. Because of a split of authority regarding the meaning of § 1512(b), we granted certiorari.[7]  543 U. S. 1042 (2005).

---

[7] Compare, *e. g., United States* v. *Shotts,* 145 F. 3d 1289, 1301 (CA11 1998), with *United States* v. *Farrell,* 126 F. 3d 484, 489–490 (CA3 1997).

Chapter 73 of Title 18 of the United States Code provides criminal sanctions for those who obstruct justice. Sections 1512(b)(2)(A) and (B), part of the witness tampering provisions, provide in relevant part:

> "Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . cause or induce any person to . . . withhold testimony, or withhold a record, document, or other object, from an official proceeding [or] alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding . . . shall be fined under this title or imprisoned not more than ten years, or both."

In this case, our attention is focused on what it means to "knowingly . . . corruptly persuad[e]" another person "with intent to . . . cause" that person to "withhold" documents from, or "alter" documents for use in, an "official proceeding."

"We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress, *Dowling* v. *United States*, 473 U. S. 207 (1985), and out of concern that 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed,' *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931)." *United States* v. *Aguilar*, 515 U. S. 593, 600 (1995).

Such restraint is particularly appropriate here, where the act underlying the conviction—"persua[sion]"—is by itself innocuous. Indeed, "persuad[ing]" a person "with intent to . . . cause" that person to "withhold" testimony or documents from a Government proceeding or Government official

is not inherently malign.[8]   Consider, for instance, a mother who suggests to her son that he invoke his right against compelled self-incrimination, see U. S. Const., Amdt. 5, or a wife who persuades her husband not to disclose marital confidences, see *Trammel* v. *United States*, 445 U. S. 40 (1980).

Nor is it necessarily corrupt for an attorney to "persuad[e]" a client "with intent to . . . cause" that client to "withhold" documents from the Government.   In *Upjohn Co.* v. *United States*, 449 U. S. 383 (1981), for example, we held that Upjohn was justified in withholding documents that were covered by the attorney-client privilege from the Internal Revenue Service (IRS).   See *id.*, at 395.   No one would suggest that an attorney who "persuade[d]" Upjohn to take that step acted wrongfully, even though he surely intended that his client keep those documents out of the IRS' hands.

"Document retention policies," which are created in part to keep certain information from getting into the hands of others, including the Government, are common in business. See generally Chase, To Shred or Not to Shred: Document Retention Policies and Federal Obstruction of Justice Statutes, 8 Ford. J. Corp. & Fin. L. 721 (2003).   It is, of course, not wrongful for a manager to instruct his employees to comply with a valid document retention policy under ordinary circumstances.

Acknowledging this point, the parties have largely focused their attention on the word "corruptly" as the key to what may or may not lawfully be done in the situation presented here.   Section 1512(b) punishes not just "corruptly persuad[ing]" another, but *"knowingly . . .* corruptly persuad[ing]" another.   (Emphasis added.)   The Government suggests that "knowingly" does not modify "corruptly per-

---

[8] Section 1512(b)(2) addresses testimony, as well as documents.   Section 1512(b)(1) also addresses testimony.   Section 1512(b)(3) addresses "persuade[rs]" who intend to prevent "the communication to a law enforcement officer or judge of the United States of information" relating to a federal crime.

suades," but that is not how the statute most naturally reads. It provides the *mens rea*—"knowingly"—and then a list of acts—"uses intimidation or physical force, threatens, or corruptly persuades." We have recognized with regard to similar statutory language that the *mens rea* at least applies to the acts that immediately follow, if not to *other* elements down the statutory chain. See *United States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 68 (1994) (recognizing that the "most natural grammatical reading" of 18 U. S. C. §§ 2252(a)(1) and (2) "suggests that the term 'knowingly' modifies only the surrounding verbs: transports, ships, receives, distributes, or reproduces"); see also *Liparota* v. *United States*, 471 U. S. 419 (1985). The Government suggests that it is "questionable whether Congress would employ such an inelegant formulation as 'knowingly . . . corruptly persuades.'" Brief for United States 35, n. 18. Long experience has not taught us to share the Government's doubts on this score, and we must simply interpret the statute as written.

The parties have not pointed us to another interpretation of "knowingly . . . corruptly" to guide us here.[9] In any event, the natural meaning of these terms provides a clear answer. See *Bailey* v. *United States*, 516 U. S. 137, 144–145 (1995). "[K]nowledge" and "knowingly" are normally associated with awareness, understanding, or consciousness. See Black's Law Dictionary 888 (8th ed. 2004) (hereinafter Black's); Webster's Third New International Dictionary 1252–1253 (1993) (hereinafter Webster's 3d); American Heritage Dictionary of the English Language 725 (1981) (hereinafter Am. Hert.). "Corrupt" and "corruptly" are normally associated with wrongful, immoral, depraved, or evil. See Black's 371; Webster's 3d 512; Am. Hert. 299–300. Joining these meanings together here makes sense both linguisti-

---

[9] The parties have pointed us to two other obstruction provisions, 18 U. S. C. §§ 1503 and 1505, which contain the word "corruptly." But these provisions lack the modifier "knowingly," making any analogy inexact.

cally and in the statutory scheme. Only persons conscious of wrongdoing can be said to "knowingly . . . corruptly persuad[e]." And limiting criminality to persuaders conscious of their wrongdoing sensibly allows § 1512(b) to reach only those with the level of "culpability . . . we usually require in order to impose criminal liability." *United States* v. *Aguilar,* 515 U. S., at 602; see also *Liparota* v. *United States, supra,* at 426.

The outer limits of this element need not be explored here because the jury instructions at issue simply failed to convey the requisite consciousness of wrongdoing. Indeed, it is striking how little culpability the instructions required. For example, the jury was told that, "even if [petitioner] honestly and sincerely believed that its conduct was lawful, you may find [petitioner] guilty." App. JA–213. The instructions also diluted the meaning of "corruptly" so that it covered innocent conduct. *Id.,* at JA–212.

The parties vigorously disputed how the jury would be instructed on "corruptly." The District Court based its instruction on the definition of that term found in the Fifth Circuit Pattern Jury Instruction for § 1503. This pattern instruction defined "corruptly" as " 'knowingly and dishonestly, with the specific intent to subvert or undermine the integrity' " of a proceeding. Brief for Petitioner 3, n. 3 (emphasis deleted). The Government, however, insisted on excluding "dishonestly" and adding the term "impede" to the phrase "subvert or undermine." *Ibid.* (internal quotation marks omitted). The District Court agreed over petitioner's objections, and the jury was told to convict if it found petitioner intended to "subvert, undermine, or impede" governmental factfinding by suggesting to its employees that they enforce the document retention policy. App. JA–212.

These changes were significant. No longer was any type of "dishonest[y]" necessary to a finding of guilt, and it was enough for petitioner to have simply "impede[d]" the Government's factfinding ability. As the Government conceded

at oral argument, "'[i]mpede'" has broader connotations than "'subvert'" or even "'[u]ndermine,'" see Tr. of Oral Arg. 38, and many of these connotations do not incorporate any "corrupt[ness]" at all. The dictionary defines "impede" as "to interfere with or get in the way of the progress of" or "hold up" or "detract from." Webster's 3d 1132. By definition, anyone who innocently persuades another to withhold information from the Government "get[s] in the way of the progress of" the Government. With regard to such innocent conduct, the "corruptly" instructions did no limiting work whatsoever.

The instructions also were infirm for another reason. They led the jury to believe that it did not have to find *any* nexus between the "persua[sion]" to destroy documents and any particular proceeding.[10] In resisting any type of nexus element, the Government relies heavily on § 1512(e)(1), which states that an official proceeding "need not be pending or about to be instituted at the time of the offense." It is, however, one thing to say that a proceeding "need not be pending or about to be instituted at the time of the offense," and

---

[10] We disagree with the Government's suggestion that petitioner's "nexus" argument is not preserved or that it is only subject to plain-error review for failure to comply with Federal Rule of Criminal Procedure 30(d). Petitioner plainly argued for, and objected to the instructions' lack of, a nexus requirement. See, *e. g.*, Record 425 (arguing for a "nexus" and explaining that "it is insufficient for the government to show that the defendant intended to affect some hypothetical future federal proceeding"); *id.*, at 931–932, 938; Tr. 4339–4345 (May 25, 2002). In so doing, it reasonably relied on language in *United States* v. *Shively*, 927 F. 2d 804, 812–813 (CA5 1991). Although the instruction petitioner proposed, based on *Shively*, does not mirror the nexus requirement it now proposes, its actions were sufficient to satisfy Rule 30(d). This argument also was preserved in the Court of Appeals, which recognized that petitioner was challenging "the concreteness of the defendant's expectation[s] of a proceeding." 374 F. 3d 281, 298 (CA5 2004); see *United States* v. *Williams*, 504 U. S. 36, 41–42 (1992). However, the Court of Appeals did not address, and petitioner did not preserve, its argument that informal inquiries are not covered by the statute. See *ibid.*

quite another to say a proceeding need not even be foreseen. A "knowingly . . . corrup[t] persaude[r]" cannot be someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material.

We faced a similar situation in *Aguilar, supra.* Respondent Aguilar lied to a Federal Bureau of Investigation agent in the course of an investigation and was convicted of "'corruptly endeavor[ing] to influence, obstruct, and impede [a] . . . grand jury investigation'" under § 1503. 515 U. S., at 599. All the Government had shown was that Aguilar had uttered false statements to an investigating agent "who might or might not testify before a grand jury." *Id.,* at 600. We held that § 1503 required something more—specifically, a "nexus" between the obstructive act and the proceeding. *Id.,* at 599–600. "[I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding," we explained, "he lacks the requisite intent to obstruct." *Id.,* at 599.

For these reasons, the jury instructions here were flawed in important respects. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*