In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-1869

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RONALD MATTHEWS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 05 CR 30009–**G. Patrick Murphy**, *Chief Judge*.

ARGUED APRIL 3, 2007—DECIDED OCTOBER 11, 2007

Before MANION, EVANS, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. During the fall of 2004, Ronald Matthews, the Chief of Police of the East St. Louis, Illinois Police Department, confronted an age-old question: how far to go to help a friend? The friend, Ayoub ("Dave") Qattoum, was a gun-toting auxiliary officer of the Department *and* a convicted felon. After an altercation with another officer ended in Qattoum's arrest and the seizure of his firearm, Qattoum called Matthews for help, and Matthews did not disappoint him. Over the next several weeks, Matthews tried to help Qattoum avoid prosecution by "losing" Qattoum's weapon. Matthews even enlisted the help of his secretary, Janerra Carson-Slaughter. But, their efforts failed and Matthews, Qattoum, and Carson-

Slaughter were charged with conspiracy to obstruct justice and attempted obstruction of justice. Matthews was also charged with perjury before the grand jury. While he went to trial, Qattoum and Carson-Slaughter pled guilty and testified against Matthews. Matthews was convicted on all counts and now appeals his convictions for obstruction of justice and conspiracy, claiming that the obstruction instructions did not sufficiently detail the elements of that offense. He also asserts that the conspiracy instructions did not identify the object of the conspiracy, failed to require unanimity as to the conspiracy's overt acts, and permitted the jury to convict based on overt acts not in furtherance of the conspiracy. Finding no prejudicial error in the instructions, we affirm.

## I. BACKGROUND

Matthews's convictions stem from his failed attempt to thwart the prosecution of Dave Qattoum for federal firearms offenses. Matthews met Qattoum in 2003 and invited him to become an auxiliary police officer, an unpaid civilian who assists in police work. As an auxiliary officer, Qattoum participated in drug raids and provided event security, all while openly carrying firearms. Yet, somehow, no one discovered that Qattoum was a felon and possibly an illegal alien, who, at the very least, remained in the country beyond his period of authorization.[1] Qattoum had

---

[1] Qattoum was born in the West Bank and moved to East St. Louis in approximately 1995. As of August 2004, Qattoum's immigration status was unclear to the Bureau of Immigration and Customs Enforcement ("ICE"). ICE began investigating Qattoum on the belief that he was present in the United States illegally, making his possession of a firearm a felony. Only in January 2005 did ICE determine that Qattoum was not techni-

(continued...)

prior convictions for felony receipt of counterfeit goods and for misdemeanor domestic battery. Without question, he was legally prohibited from carrying a firearm.

Qattoum cultivated close relationships with East St. Louis councilmen and city officials, often using bribes to advance his business interests. During Qattoum's time as an auxiliary officer, he and Matthews became close friends, speaking on a daily or weekly basis. Qattoum lent Matthews $500 so that Matthews could post bond for his girlfriend and at Matthews's request provided her with a cellular phone. Qattoum also gave Matthews free food and beverages at the convenience store and gas station he owned.

While driving to an assignment on August 7, 2004, Qattoum heard Detective Dan Hill radio for assistance with a traffic stop of suspected drug dealers and offered his assistance. Officer Lance Murphy replied that he would assist and directed Qattoum not to respond. Qattoum disregarded Murphy, stopped the vehicle, pointed his revolver at the driver, and ordered him out of the vehicle. After Hill arrested the driver, Murphy arrived on the scene and ordered Qattoum to leave or face arrest. Qattoum refused to leave and resisted Murphy's attempts to handcuff him. A physical altercation ensued, ending in Qattoum's arrest for aggravated battery of a police officer and seizure of Qattoum's .38 revolver.

Qattoum phoned Matthews from the police station for assistance. They met outside the station with Deputy Chief of Police Rudy McIntosh and two city officials. McIntosh, who was then cooperating with the FBI on a corruption investigation, reported this meeting to the FBI and later recorded several incriminating conversations played at

[1] (...continued)
cally present illegally because he had a pending petition to change his immigration status.

trial. According to Qattoum, Matthews assured Qattoum that the Department would handle the matter "in-house" and that no charges would be brought. From that moment, Matthews committed himself to fulfilling that promise.

Although Qattoum was facing serious felony charges, that night Matthews ordered him released without bond. Matthews assigned detectives for a criminal and an internal investigation. The detective assigned to the internal investigation testified that Matthews told him not to speak with anyone about the investigation and not to copy any documents pertaining to the investigation. Both detectives quickly discovered Qattoum's criminal history and notified Matthews within the week. On August 17, 2004, the criminal investigator spoke with the Bureau of Immigration and Customs Enforcement ("ICE") about Qattoum's immigration status. ICE informed her that it needed the revolver to charge Qattoum as an illegal alien in possession of a firearm, and she relayed this information to Matthews. On August 20, Matthews was recorded telling McIntosh that ICE was pursuing federal firearms charges and saying "if the key is the damn weapon, we've got to get the weapon."

On August 31 and September 1, 2004, Matthews was recorded instructing his internal affairs officer to retrieve the firearm and bring it directly to him. According to the internal affairs officer, on September 1, Matthews said he was not "going to help the INS fuck Dave [Qattoum]." That day, the internal affairs officer retrieved the revolver from the East St. Louis Police Department and turned it over to Matthews without requiring Matthews to acknowledge receipt of the gun in writing. In a recording on September 2, Matthews told McIntosh that "[t]he biggest half of the worry is out of the way. We got the gun." Further, he claimed, "INS can't do shit now. We got the gun. It ain't even in evidence."

Meanwhile, Matthews continued his campaign to derail the state prosecution. The St. Clair County State's Attorney testified that in late August, just days after a newspaper featured Qattoum's story, Matthews called the State's Attorney to discuss Qattoum. During the conversation, Matthews told the State's Attorney that he was going to exercise his discretion to handle the incident internally. Without describing the facts of the incident, explaining his relationship to Qattoum, or informing the State's Attorney of Qattoum's felon and immigration status, Matthews asked for, and received, the State's Attorney's approval of his decision to handle the matter internally. Matthews then directed the officers conducting the internal and criminal investigations of Qattoum to turn over all investigatory files to him, and he removed them from the investigation. When the criminal investigator questioned the order to turn over her files, Matthews threatened to suspend her. After giving up her files, the criminal investigator was forced to abandon her plan to pursue state charges against Qattoum.

In the middle of September, at the instigation of the FBI, ICE stepped up its efforts to retrieve the revolver. When ICE agents met with Matthews on September 30, 2004, he turned over case files but refused to release the weapon without a court order. He claimed the gun was needed for the Department's internal investigation. Carson-Slaughter, Matthews's secretary and co-defendant, testified that around this time Matthews approached her for help altering reports concerning Qattoum and smuggling the gun out of the department. According to Carson-Slaughter, Matthews explained that he could not dispose of the gun himself because "he knew that the Feds were snooping around" and he did not want to draw any attention. Matthews instructed Carson-Slaughter to ask McIntosh to get $1500 from Qattoum in exchange for the gun. For her participation, Matthews promised to give Carson-Slaughter $300.

After numerous discussions with McIntosh, all with Matthews's knowledge, Carson-Slaughter seized an opportunity on October 11, 2004. While Matthews was out of the office, she took the revolver from his desk and delivered it to McIntosh. Carson-Slaughter testified that she called Matthews and informed him of the exchange that evening. Later that week, she collected $1500 from McIntosh, gave Matthews $1200, and she kept $300. Qattoum testified that after this happened Matthews told him not to worry and that the firearm was gone. However, unbeknownst to Matthews, McIntosh had turned the revolver over to the FBI.

On October 19, 2004, ICE agents served Matthews with a grand jury subpoena directing the East St. Louis Police Department Custodian of Records to turn over the firearm. On November 16, 2004, Matthews appeared before the grand jury in response to the subpoena. That day, the internal affairs investigator claims Matthews reaffirmed that he was "not going to help INS fuck Dave [Qattoum]." While testifying before the grand jury, Matthews made a number of statements that formed the basis for his perjury charge, including that he had last seen the revolver the day after he received the subpoena and that he had not spoken with Qattoum about the August 7, 2004 incident or the grand jury subpoena.

As a result, Matthews was charged with, and convicted of, conspiracy to obstruct justice, in violation of 18 U.S.C. § 371; attempted obstruction of justice, pursuant to 18 U.S.C. §§ 1512(c)(1) and 2; and perjury before the grand jury, a violation of 18 U.S.C. § 1623. Matthews was sentenced to thirty-three months' incarceration and now appeals his convictions for conspiracy to obstruct justice and attempted obstruction of justice. Although Matthews offers an alternate account of the events, portraying McIntosh and Carson-Slaughter as the ones who sought to protect Qattoum from prosecution by

concealing the gun, he does not challenge the sufficiency of the evidence in support of his convictions. Instead, he contends that his convictions arose from infirmities in the jury instructions. We consider each of his arguments below.

## II.  ANALYSIS

### A.  Standard of Review

"We review jury instructions de novo to determine whether they provide fair and accurate summaries of the law." *United States v. Darif*, 446 F.3d 701, 709 (7th Cir. 2006) (quotation marks and citations omitted). Mindful that the "formulation of jury instructions is not an exact science," we give the district court "substantial discretion with respect to the precise wording of jury instructions," so long as the instructions represented a complete and correct statement of law. *Id.* (quotation marks and citations omitted). And, we will reverse the jury's verdict only if the instructions, "viewed as a whole, misguide[d] the jury to the litigant's prejudice." *United States v. Ramsey*, 406 F.3d 426, 431 (7th Cir. 2005) (quotation marks and citations omitted).

### B.  The Attempted Obstruction of Justice Instructions Were Adequate

Matthews argues three errors in the instructions for obstruction of justice under 18 U.S.C. § 1512(c)(1). First, he contends the instructions contained an erroneous definition of "corruptly." Second, he believes the instructions failed to require proof of a sufficient nexus between his acts and a particular official proceeding. Third, Matthews says the instructions did not require the jury to find that his efforts to conceal the gun were corrupt.

Common to each of these arguments is a suggestion that the jury instructions understated the mens rea necessary for an obstruction of justice conviction. For reasons detailed below, we disagree.

Before proceeding to Matthews's arguments, we set forth the relevant statutory provisions and jury instructions. Section 1512(c)(1) provides that:

> (c) Whoever corruptly–
>
> > (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding . . . shall be fined under this title or imprisoned not more than 20 years, or both.

The district court instructed the jury that to convict Matthews of attempted obstruction of justice under § 1512(c)(1), it must be satisfied that the government proved the following propositions:

> First, Ronald Matthews attempted to destroy or conceal an object; second, Ronald Matthews acted with intent to impair the object's availability for use in an official proceeding; and third, Ronald Matthews acted corruptly.
>
> . . .
>
> For purposes of these instructions an official proceeding need not be pending or about to be instituted at the time of the offense.
>
> The term "official proceeding" as used in these instructions means the federal grand jury for the Southern District of Illinois.
>
> "Corruptly" as used in these instructions, means that the defendant acted with the purpose of wrongfully impeding the due administration of justice.

### 1. "Corruptly" Was Properly Defined

We begin with Matthews's contention that the instructions provided a flawed definition of the word "corruptly." According to Matthews, the district court should have defined "corruptly" to mean acting "with an improper motive or with an evil or wicked purpose." Matthews says the district court's failure to give this instruction permitted him to be punished for innocent conduct. In this instance, he contends, the word "corruptly" did not serve its intended function of distinguishing innocent obstructive acts—such as an attorney's act of advising his client to assert the right to remain silent—from corrupt obstructive acts. Although this argument is not without force, it ultimately fails.

For his argument, Matthews relies heavily on *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), where the Court explained how the word "corruptly" serves to separate criminal and innocent acts of obstruction. *Arthur Andersen* concerned the elements of obstruction of justice under 18 U.S.C. § 1512(b), which criminalizes "knowingly . . . corruptly persuad[ing] another person . . . with intent to  . . . cause or induce any person to . . . conceal an object with intent to impair the object's integrity or availability for use in an official proceeding." *Id.* at 703. Arthur Andersen was convicted of obstructing justice under that section because it destroyed documents related to its representation of Enron Corporation after obtaining knowledge of an ongoing SEC investigation of Enron. In reversing Arthur Andersen's conviction, the Court observed that it is not necessarily corrupt to persuade another person to withhold documents from a government proceeding, even with the intent to impede government factfinding. *Id.* at 703-04. If the intent to impede a proceeding were corrupt per se, the Court reasoned, an attorney who persuades his client to withhold

documents under a valid claim of privilege would be guilty of obstruction. *Id.* at 704.

The Court then considered whether the district court's instructions were so broad as to prohibit innocent acts of obstruction and concluded that they were. The Court noted that the district court was initially inclined to instruct the jury that "corruptly" meant "knowingly and dishonestly, with the specific intent to subvert or undermine the integrity" of a proceeding. *Id.* at 706. However, at the government's request, the district court excluded the word "dishonestly" from the definition, ultimately instructing the jury "to convict if it found [the defendant] intended to 'subvert, undermine, or impede' governmental factfinding . . . ." *Id.* With that change, "[n]o longer was any type of 'dishonesty' necessary to a finding of guilt, and it was enough for petitioner to have simply 'impeded' the Government's factfinding ability." *Id.* Stripped of any requirement that the defendant act dishonestly, "[t]he instructions diluted the meaning of 'corruptly' so that it covered innocent conduct." *Id.* Matthews claims that the definition of "corruptly" in his instructions erred in a similar fashion; we do not agree.

In this case, the district court's definition of "corruptly" did not create the misimpression that any act designed to impede prosecution is inherently corrupt. Rather, citing the Seventh Circuit's pattern jury instructions verbatim, the district court defined "corruptly" as acting "with the purpose of *wrongfully* impeding the due administration of justice." *See* Seventh Circuit Pattern Criminal Federal Jury Instructions for 18 U.S.C. § 1503 (1999) (emphasis added).[2] Unlike *Arthur Andersen*, where "the 'corruptly'

―――――――――――

[2] In defining "corruptly," the district court relied upon the Seventh Circuit's pattern jury instruction for 18 U.S.C. § 1503
(continued...)

instructions did no limiting work whatsoever," *id.*, the instruction in this case specifically required a finding that Matthews had the purpose to "wrongfully" impede. Matthews protests that this was hardly enough. He urges that "corruptly" means to act "with an improper motive or with an evil or wicked purpose" and that "wrongfully" fails to convey that meaning. But we do not think the word "corruptly" need be read so narrowly.

First, in *Arthur Andersen*, the Court propounded a definition of corruptly that is consistent with that provided in this case. The Court noted that "'[c]orrupt' and 'corruptly' are normally associated with *wrongful*, immoral, depraved, *or* evil." 544 U.S. at 705 (emphases added); *see United States v. Quattrone*, 441 F.3d 153, 173 (2d Cir. 2006) (defining the "corrupt" intent required for a § 1503 conviction as a "'wrongful' or 'immoral' intent to obstruct the grand jury's administration of justice").

Second, we think the word "wrongfully" performs the "limiting work" discussed in *Arthur Andersen.* As explained in *Arthur Andersen*, under limited circumstances, a defendant is privileged to obstruct the prosecution of a crime. That privilege flows from the defendant's enjoyment of a legal right—such as the right to avoid self-incrimination. By including the word "wrongfully" in the definition of "corruptly" and criminalizing only the act of "wrongfully impeding the due administration of justice," the instructions directed the jury to convict only

---

[2] (...continued)

because no model instruction has been drafted for 18 U.S.C. § 1512. Because both sections prohibit similar types of conduct, it was proper for the district court to reference § 1503 in arriving at a definition for "corruptly" under § 1512. Matthews does not suggest otherwise, and, in fact, he references § 1503 in making several of his arguments.

those who have no legal right to impede justice. *Cf. United States v. Bohle*, 445 F.2d 54, 60 (7th Cir. 1971) (explaining that to seize a plane with a "wrongful intent" means to act with "the general criminal intent present when one seizes or exercises control of an aircraft without having any *legal right* to do so.") (emphasis added), *overruled on other grounds by United States v. Lawson*, 653 F.2d 299, 303 n.12 (7th Cir. 1981). Thus, we see no reason to narrow our definition of the word "corruptly," particularly when the Supreme Court has not retreated from our formulation.

Moreover, even if we were to accept Matthews's view that the district court defined "corruptly" too broadly, he still could not prevail. Matthews has simply failed to show that he was prejudiced by the district court's definition of "corruptly." *See Neder v. United States*, 527 U.S. 1, 9-10 (1999) (harmless-error analysis applies when a district court's jury instructions omit or misstate an element of an offense). Specifically, he does not explain how he would have benefitted had the district court defined corruptly in accordance with his wishes to mean acting with "improper motive." The overwhelming evidence established that Matthews orchestrated a scheme to conceal Qattoum's revolver from federal investigators in effort to thwart a federal firearms prosecution, and the apparent motive for his obstructive acts—helping a friend escape legitimate prosecution—is surely improper. Therefore, we find, beyond a reasonable doubt, that Matthews was not prejudiced by the district court's failure to offer Matthews's proposed definition of "corruptly." *See United States v. Haddad*, 462 F.3d 783, 793 (7th Cir. 2006) (An "error is harmless if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'") (quoting *Neder*, 527 U.S. at 18).

## 2.  The Instructions Linked the "Corruptly" Element to the Other Elements of the Offense

On appeal, Matthews argues for the first time that the instructions did not indicate that the word "corruptly" was meant to modify the acts of destroying or concealing the gun. The argument goes: because the attempted obstruction of justice instruction listed "corruptly" as an independent third element, the jury was led to convict based on a finding that Matthews had acted corruptly in ways unrelated to the first two elements of the offense. As he failed to raise this argument below, we review only for plain error. *United States v. Allen*, 390 F.3d 944, 952 (7th Cir. 2004); Fed. R. Crim. P. 52(b).

Matthews's interpretation unreasonably parses the instruction. Contrary to his claim that the instructions placed " 'corruptly' conspicuously by itself, as a solitary third element," the "corruptly" element immediately followed the other two elements of the offense; and all three appeared in the same sentence. The first element required a finding that "Matthews attempted to destroy or conceal an object." The next two elements refer back to and modify the first. Both the clause that Matthews challenges ("Matthews acted corruptly") and the preceding clause ("Matthews acted with the intent to impair the object's availability") naturally describe the acts of attempting to conceal or destroy the object. The instructions fairly and adequately indicated that the jury needed to find that Matthews corruptly attempted to conceal the firearm.

Furthermore, we note that this is a typical and unproblematic structure for presenting mens rea elements. *See, e.g.*, Seventh Circuit Pattern Criminal Federal Jury Instructions for 18 U.S.C. § 152(6) ("Third, the defendant acted knowingly and fraudulently."); Seventh Circuit Pattern Criminal Federal Jury Instructions for 26 U.S.C. § 7203 ("Third, defendant acted willfully"); Seventh

Circuit Pattern Criminal Federal Jury Instructions for 18 U.S.C. § 286 ("Fourth, that the defendant acted with the intent to defraud."). We find no error in the structure of the obstruction of justice instruction.

### 3.  The Nexus Requirement Was Met

Matthews next contends that the district court erred in failing to require a meaningful nexus between the grand jury proceeding and his attempts to conceal the weapon. The instructions, he claims, permitted the jury to convict him even if it found that he only intended to impede an *investigation*, rather than a proceeding. At times, Matthews goes so far as to say that he should not have been convicted unless he knew that a proceeding was pending. As he preserved these arguments for appeal, our review is de novo. *See Darif*, 446 F.3d at 709.

We begin by considering whether 18 U.S.C. § 1512(c)(1) requires a showing of "nexus." In *Arthur Andersen*, the Court held that § 1512(b)(1) encompasses a "nexus" requirement. 544 U.S. at 707-08. This means that to convict a defendant of obstructing justice under that subsection, "the [obstructive] act must have a relationship in time, causation, or logic with the judicial proceedings." *United States v. Aguilar*, 515 U.S. 593, 599 (1995). The government had argued against finding a "nexus" requirement under § 1512(b)(1), because to convict a defendant under any of 18 U.S.C. § 1512's subsections, "an official proceeding 'need not be pending or about to be instituted at the time of the offense.'" *Arthur Andersen*, 544 U.S. at 707 (quoting 18 U.S.C. § 1512(e)(1), now codified at § 1512(f)(1)). However, the Court admonished: "It is . . . one thing to say that a proceeding 'need not be pending or about to be instituted at the time of the offense,' and quite another to say a proceeding need not even be foreseen. A 'knowingly . . . corrupt persuader'

cannot be someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material." *Id.* at 707-08.

We believe that logic applies with equal force to § 1512(c)(1) because that subsection, like § 1512(b)(1), speaks in terms of the relationship between obstructive acts and a proceeding. *Compare* § 1512(b)(1) (requiring that a defendant act "with intent to . . . influence, delay or prevent the testimony of any person in an official proceeding"), *with* § 1512(c)(1) (requiring that defendant act "with the intent to impair the object's integrity or availability for use in an official proceeding"). Accordingly, before a defendant may be convicted of obstruction under § 1512(c)(1), he must believe that his acts will be likely to affect a pending or foreseeable proceeding. *See Arthur Andersen*, 544 U.S. at 707; *United States v. Kaplan*, 490 F.3d 110, 125 (2d Cir. 2007) ("[A] 'knowingly . . . corrupt persuader' must believe that his actions are likely to affect a particular, existing or foreseeable official proceeding.").[3]

We think the jury instructions did an adequate job of conveying the "nexus" required under § 1512(c)(1). The

---

[3] In *United States v. Aguilar*, 515 U.S. 593 (1995), the Court read a "nexus" requirement into the omnibus clause of 18 U.S.C. § 1503. "[S]ection 1503 as read by the Supreme Court requires an attempt to obstruct a pending judicial proceeding; no such requirement of a pending proceeding exists in section 1512." *United States v. LeMoure*, 474 F.3d 37, 43 (1st Cir. 2007) (citations omitted). Given this important distinction between § 1503 and § 1512, Matthews's reliance on *Aguilar* is misplaced, and his contention that he should not have been convicted unless he knew a proceeding was pending at the time he engaged in obstructive acts is simply wrong.

instructions required the jury to find that "Matthews attempted to conceal . . . an object," and that he did so "with intent to impair the object's availability *for use in an official proceeding*." (Emphasis added). The district court then specified that this "official proceeding" was "the federal grand jury for the Southern District of Illinois." Under these instructions, the jury could only convict Matthews if it found that he attempted to conceal the gun with the intent to prevent its use in the federal grand jury. Contrary to Matthews's claim that the instructions eliminated any nexus, this instruction directly connected his acts with the grand jury proceeding. And, under these instructions, the jury could not have convicted Matthews without finding that he foresaw the grand jury proceedings; Matthews could not have acted with "intent" to impair the grand jury proceedings without some inkling that those proceedings were upcoming. The instructions did not misstate § 1512(c)(1)'s nexus requirement.

## C.  The Conspiracy Instruction Was Adequate

Matthews also assigns several errors to the conspiracy instruction. First, he contends that the instruction did not identify the crime that Matthews was charged with conspiring to commit; second, that the instruction failed to require unanimity as to the overt act committed in furtherance of the conspiracy; and third, that the jury was permitted to identify as an overt act in furtherance of the conspiracy, acts committed before the conspiracy's objective formed. As Matthews did not object to the conspiracy instructions in the district court, we review these arguments for plain error. *Allen*, 390 F.3d at 952; Fed. R. Crim. P. 52(b).

Tracking verbatim the Seventh Circuit's pattern jury instruction for conspiracy, the district court told the jury

that to convict Matthews of conspiracy to obstruct justice, the government had to prove:

> First, that the conspiracy as charged in Count 1 existed; and

> Second, that Ronald Matthews knowingly became a member of the conspiracy with an intention to further the conspiracy; and

> Third, that an overt act was committed by at least one conspirator in furtherance of the conspiracy.

> If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find Ronald Matthews guilty on Count 1.

*See* Seventh Circuit Pattern Criminal Federal Jury Instructions 5.08.

### 1. The Jury Found At Least One Overt Act in Furtherance of the Conspiracy

Matthews argues that the jury might have convicted him of conspiracy to obstruct justice without agreeing as to which overt act was committed in furtherance of the conspiracy. The indictment charged eighteen overt acts. The court gave a general unanimity instruction, but it did not specify that the jurors had to be unanimous as to which overt acts were performed. These facts, Matthews says, imperiled his right to a unanimous jury verdict. *See United States v. Fawley*, 137 F.3d 458, 470 (7th Cir. 1998) (discussing federal criminal defendant's right to a unanimous verdict). On the facts of this case, however, we find no such risk.

We can be sure that the jury was unanimous as to at least one overt act in furtherance of the conspiracy, and no

more is required. *See United States v. Soy*, 454 F.3d 766, 768 (7th Cir. 2006). Specifically, the jury unanimously found Matthews guilty of the perjury count, and Matthews does not challenge that conviction. As discussed below, the facts underlying the perjury conviction are the same as those alleged in Overt Act Q.

With respect to the perjury count, the indictment alleged that, on November 16, 2004, Matthews testified that the East St. Louis Police Department had seized a firearm from Qattoum on August 7, 2004, but that the Department could no longer locate the weapon. Further, the indictment charged that Matthews falsely testified before the grand jury that he had not spoken with Qattoum about the case since August 7, and had never spoken with Qattoum about the grand jury subpoena. He was also alleged to have told the grand jury that he last saw the weapon sometime around or about October 19, 2004, the day he received the subpoena. However, the indictment notes that, as of October 19, Matthews knew that the firearm had been removed from the Department.

Overt Act Q of the conspiracy recites the exact same allegations of perjury before the grand jury:

> On or about November 16, 2004, RONALD MATTHEWS appeared before the Federal grand jury in East St. Louis, Illinois and testified that the East St. Louis Police Department had, in fact, seized a firearm from AYOUB S. QATTOUM on August 7, 2004, but that the Department could not locate the actual physical weapon seized from AYOUB S. QATTOUM. MATTHEWS falsely testified that he had not discussed the case or the Federal grand jury subpoena with QATTOUM. Further, MATTHEWS falsely testified that he last saw the firearm on or about October 19, 2004, when he was served with the Federal grand jury subpoena by the ICE Special Agent.

Given the complete overlap between Overt Act Q and the facts underlying Matthews's perjury conviction, we find that the jury did agree unanimously on at least one overt act. Matthews attempted to argue against this conclusion at oral argument, contending that his perjury could not have furthered the conspiracy to conceal the gun, because the government was in possession of the gun at that time. This argument is legally flawed. "A conspiracy does not automatically terminate simply because the Government, unbeknownst to some of the conspirators, has 'defeated' the conspiracy's 'object.'" *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003). When Matthews testified, he was unaware that McIntosh had already given the gun to the FBI. Even though his lies had no hope of advancing the conspirators' goals, they were nonetheless acts legally "in furtherance" of the conspiracy. *See United States v. La Budda*, 882 F.2d 244, 248 (7th Cir. 1989) ("[D]efendants can be found guilty of criminal conspiracy even though the object of their conspiracy is unattainable from the very beginning." (citations omitted)). The omission of a specific unanimity instruction on the overt acts was not plain error and did not affect Matthews's substantial rights.

We should note however that if either party had requested a unanimity instruction or a special verdict form on the overt acts, unanimity would not have been an issue in this case. Counsel should seriously consider making such requests in the future.

### 2. The Remaining Arguments Are Without Merit

Matthews asserts that it was legal error to allow the jury to consider overt acts occurring before the initiation of grand jury proceedings. He maintains that acts occurring before he became aware of the grand jury proceedings could not have furthered a conspiracy whose charged

object was "to impair the firearm's availability for use in an official proceeding." We review this forfeited argument for plain error. *Allen*, 390 F.3d at 952; Fed. R. Crim. P. 52(b).

In making this argument, Matthews all but ignores § 1512(f)(1), which provides that "an official proceeding need not be pending or about to be instituted at the time of the offense." This plainly means that a defendant may obstruct justice in violation of § 1512(c)(1) even before a judicial proceeding is ongoing. As we stated above, a defendant may obstruct justice under § 1512(c)(1) if he believes that his acts will be likely to affect a *foreseeable* proceeding. *See Arthur Andersen*, 544 U.S. at 707; *Kaplan*, 490 F.3d at 125. Since the government supplied ample evidence—including Matthews's own recorded statements—to support its claim that Matthews thought judicial proceedings likely if he did not dispose of the firearm, it was not plain error to submit the challenged overt acts to the jury for consideration.

Mathews also argues that the conspiracy instruction was flawed because it did not specify the crime he conspired to commit or identify the object of the conspiracy. Rather than simply excerpting the language of the indictment, the instruction incorporates the counts of the indictment by reference. As the jury had access to the indictment, that was entirely proper.[4]

---

[4] Further, Matthews contends that because the conspiracy to obstruct justice offense incorporates the elements of obstruction of justice, the conspiracy instruction inherited the infirmities of the obstruction of justice instruction. Given our conclusion that the district court gave a proper instruction on the obstruction of justice count, this derivative argument fails.

## III.  CONCLUSION

For the aforementioned reasons, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*