In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-2823

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PATRICK M. MCKIBBINS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 5—**Robert W. Gettleman**, *Judge.*

ARGUED MAY 5, 2011—DECIDED SEPTEMBER 6, 2011

Before MANION, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* On his way to a park in the suburbs of Chicago, Patrick McKibbins was arrested. McKibbins thought that he was going to meet "Ashley," with whom he had been chatting online for several months. To his surprise, "Ashley" was a local police officer, not a teenager. After his detention hearing, McKibbins called his family and asked them to remove and conceal some electronics in his bedroom. McKibbins was

convicted of three crimes in conjunction with these events; two related to sexual activity with minors, and one for obstruction of justice.

On appeal, McKibbins argues that the district court abused its discretion by admitting unduly prejudicial propensity evidence in violation of Federal Rule of Evidence 404(b). Specifically, McKibbins identifies two groups of photographs that he thinks should have been excluded: (1) four images of suspected child pornography, and (2) over 200 nonpornographic "profile" pictures of mostly "young looking" women. We find the images to be direct evidence on the obstruction count and thus do not reach the Rule 404(b) argument. That said, we agree with McKibbins that the district court erred by failing to consider whether the danger of unfair prejudice from these images substantially outweighed its probative value, as it was required to do by Rule 403. In the end, however, we find this error harmless, and affirm.

## I

On November 22, 2007, McKibbins was surfing the internet and ended up in a chat room dedicated to the subject "Chicago." There, he sent an instant message to "Ashley," who was actually a police officer posing as a 15-year-old girl; McKibbins was 40 at the time. After several hours of chatting, at times in sexually explicit terms, McKibbins asked when he could meet "Ashley," who said she lived in a suburb of Chicago. McKibbins offered to drive down from his home in Milwaukee, but "Ashley" canceled that meeting. Over the next few

weeks "Ashley" and McKibbins engaged in five additional chats. Like the first, these later chats were at times sexually explicit, and McKibbins masturbated in front of a webcam at least one time. Over the course of these online conversations, the officer sent McKibbins a photograph of an approximately 15-year-old girl in a cheerleading uniform. The transmittal identified the girl as "Ashley" and matched the image "Ashley" had used as a profile picture for the chat room. In reality, the picture was that of another police officer from her high school days.

These chats eventually culminated with a second plan to meet in person, this time on January 3, 2008, at a park near "Ashley's" house. That afternoon, while being followed by federal agents, McKibbins left his house, drove to the Chicago area, and called an undercover phone number to talk to a police officer posing as "Ashley." The phone call confirmed the meeting, and so McKibbins left the highway, parked his car, and proceeded toward the park. McKibbins was arrested on the way, however, and a search incident to arrest turned up two boxes of condoms in his pocket. Though local police officers spearheaded the online investigation, McKibbins was taken into custody by the federal agents who had tracked his trip across state lines.

A few days later, McKibbins appeared for a detention hearing, at which he learned that the government had obtained a search warrant allowing agents to search and seize his computer and other electronic storage devices. He also learned that the officers might be going to his

home that afternoon. With a sense of urgency, McKibbins made several calls to family members with whom he lived in Milwaukee. (McKibbins lived in his mother's house.) In the first call, McKibbins emphasized his concern that the government would take his computer. Though he said that he was "just taking precautions" and did not "think there's anything on the computer" he admitted that he would "play around on the computer," which is why he asked his brother to "get that damn computer" out of his bedroom and hide it in the crawl-space behind a closet. McKibbins also asked his brother to give a number of CDs and floppy disks located near his gerbil cage to a family member named John. In the second call, McKibbins briefly spoke with his mother and then with John. John, however, was worried that touching anything in McKibbins's bedroom might make him an accessory to some crime; he presciently implored McKibbins to stop trying to have people "get rid of that thing" because "they're gonna figure you're trying to hide something if you do that." McKibbins responded: "I don't really want them, basically, to have my computer." McKibbins again said he had not "done" anything on the computer other than "receive[] shit." He was particularly worried about his chat room history and instant messages he had sent to other young, potentially minor, women. As he did in the first call, McKibbins tried to persuade John to hide the disks near his gerbil cage, which included games and a CD labeled "Cat Women." John refused to touch anything. In a third call, McKibbins again asked his mother to give the Cat Women disc to John. All these efforts were unsuccess-

ful: the government agents executed the warrant and seized the computer, CDs, and floppy disks.

These events led to a three-count indictment against McKibbins for (1) knowingly attempting to persuade a minor to engage in sexual activity, 18 U.S.C. § 2422(b); (2) travel in interstate commerce for the purpose of engaging in a prohibited sexual act with a minor, *id.* at § 2423(b); and (3) obstruction of justice for attempting to destroy his electronics with the intent to deprive the government of its use, *id.* at § 1512(c). Before trial, through a motion *in limine*, the government revealed its plan to introduce two sets of evidence from the materials seized at McKibbins's house: first, it wanted to use four pictures of suspected child pornography; and second, it intended to introduce over 150 "profile" pictures of mostly young women. Many of the photographs in the latter group were cached on McKibbins's computer as head-shots of women with whom he had chatted online either through a website called PalTalk or via instant messages sent on Yahoo! Messenger. McKibbins opposed the motion, arguing that the images were propensity evidence barred by Rule 404(b), and in any event were unfairly prejudicial. The district court initially allowed the images on three alternative bases: (1) as direct evidence on the obstruction charge; (2) as evidence that was "inextricably intertwined" with the obstruction charge; or (3) as evidence of McKibbins's intent or motive, which are acceptable alternate purposes recognized by Rule 404(b). Thereafter, the government introduced nine more profile images, which the district court admitted. In so doing, the court relied

on its first rationale alone—that the evidence was "directly related to what [McKibbins] attempted to destroy." Just before trial, the government sought to introduce yet another 100-picture batch of profile images of young women. It found these on the Cat Women CD. In granting this motion, the district court rejected McKibbins's argument that the images were cumulative, ruling instead that "[b]ecause it's an obstruction charge, everything he's tried to obstruct and the volume of the stuff he's trying to obstruct goes to his motive." Also on the hard drive and Cat Women CD were copies of the cheerleading picture, but McKibbins has not challenged the introduction of that photograph.

The case went to the jury, which convicted McKibbins on all three counts. This appeal followed.

**II**

The only issue before us is whether the district court abused its discretion in admitting the images found at McKibbins's house and, if so, whether that error was nonetheless harmless. Because we have disapproved of the "inextricably intertwined" rationale, *United States v. Gorman*, 613 F.3d 711, 719 (7th Cir. 2010), and the district court did not focus on it much, we ignore it. In fact, McKibbins concedes that the district court admitted the suspected child pornography and profile pictures as direct evidence of the obstruction charge. The question then becomes whether the district court was right to categorize those images in this way, or if it instead needed to treat them as images of prior bad acts under

Rule 404(b). Because we find that the district court did not abuse its discretion by deeming the images evidence on the obstruction count, we do not reach the question whether the evidence could have come in under Rule 404(b) (although we see this as a much closer call), as Rule 404(b) is not concerned with direct evidence of a charged crime. See *United States v. Adams*, 628 F.3d 407, 414 (7th Cir. 2010).

Under section 1512(c), the government had to prove that McKibbins "corruptly" altered, destroyed, mutilated, or concealed the images on his computer, CDs, and disks, and that he did so with the intent to impair the objects' "integrity or availability for use in an official proceeding." 18 U.S.C. § 1512(c). The intent element is important here because the word "corruptly" is what "serves to separate criminal and innocent acts of obstruction." *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007). In *Arthur Anderson, LLP v. United States*, 544 U.S. 696 (2005), the Supreme Court emphasized the government's burden in proving intent for an obstruction offense under section 1512(c). Without a showing of a willful, corrupt *mens rea* that has a nexus to an official proceeding, the government cannot meet its burden. See *id.* at 704-08; see also, *e.g.*, *United States v. Aguilar*, 515 U.S. 593, 598-600 (1995); *Matthews*, 505 F.3d at 707-08.

The district court's theory was that everything on the computer was direct evidence of obstruction because it demonstrated why McKibbins worked so hard to get one of his family members to destroy or hide the electronic storage media. We think this is a fair reading of

the phone calls described above. The timing of the phone calls is especially revealing. McKibbins made these somewhat frantic calls after a detention hearing that focused heavily upon whether he could be given bail in exchange for his computer, and in which he found out that the government was planning to execute a search warrant for the electronics that day. Given the nature of McKibbins's courtship with the officer posing as "Ashley," he had every reason to be worried, as he must have known that the government would find additional incriminating images or chats on his computer. This evidence of obstruction was helpful even though, given the nature of the government's sting operation and the obvious manner in which McKibbins tried to conceal the electronics, the government had ample probative evidence—including transcripts of the phone calls, the chat logs, and the cheerleader picture on the hard drive and Cat Women CD—of McKibbins's "corrupt intent" even apart from the profile images or the suspected child pornography.

The Federal Rules of Evidence do not limit the government to the "most" probative evidence; all relevant evidence is admissible and the Rules define relevance broadly as evidence "having any tendency to make the existence of any fact . . . more probable or less probable." FED. R. EVID. 401; *id.* at RULE 402; see generally *Old Chief v. United States*, 519 U.S. 172, 178-79 (1997) (discussing the relation between Rules 401 and 402). The images introduced meet this broad standard and drive home McKibbins's *mens rea*. Especially telling are McKibbins's admissions that he had been "receiving shit" online and

his numerous references during the phone calls to instant message conversations with other women he suspected were under-age. The suspected pornography and profile pictures could have related precisely to these concerns. With these facts in the record, and the Supreme Court's emphasis in *Arthur Anderson* on the government's burden in proving the intent element under the obstruction statute, we cannot conclude the district court abused its discretion here.

McKibbins resists this conclusion by pointing to *United States v. Black*, where we explained that section 1512(c) does not "require proof of obstruction, as distinct from intent to obstruct, in order to convict." By this we meant that the statute does not include a "materiality" requirement, because denying the importance or materiality of a piece of evidence is itself a form of obstruction. 625 F.3d 386, 389 (7th Cir. 2010). The relevant intention is directed at making the government's job harder in proving its case, not at actually succeeding in that effort. Thus, the government was not *required* to prove that anything related to the two sex-offense charges turned up on the hard drive, CDs, or disks. See *id.*; *United States v. Senffner*, 280 F.3d 755, 762 (7th Cir. 2002). McKibbins is right, then, that it was not mandatory for the government to prove materiality, but that does not mean that the converse—that it would be error for the government to demonstrate materiality—is true. The more material the evidence, the stronger the inference of intent will be, and the district court was entitled to allow this evidence on those grounds. In fact, in some instances, demonstrating materiality might be

necessary to show a "corrupt" *mens rea*. If, for example, documents are routinely destroyed after a given time, then a suspect's following that standard policy even in the shadow of an official proceeding might seem innocuous, unless the government could tell a convincing story that the destroyed information was material.

But, as McKibbins points out, even if the images are direct evidence, the court still had an obligation to evaluate the evidence under Rule 403, which is incorporated into the Rule 404(b) analysis. See *United States v. Hicks*, 635 F.3d 1063, 1069 (7th Cir. 2011). This was the main thrust of McKibbins's opposition to the motion *in limine* filed by the government. Under Rule 403, the district court should exclude evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. Because all probative evidence is to some extent prejudicial, we have consistently emphasized that Rule 403 balancing turns on whether the prejudice is "unfair." See, *e.g.*, *United States v. Hanna*, 630 F.3d 505, 511 (7th Cir. 2010); *United States v. Zawada*, 552 F.3d 531, 535 (7th Cir. 2008).

The district court conducted no weighing of the evidence—or if it did, it said nothing about this—even after admitting it as direct evidence or as relevant to intent under Rule 404(b). This was error. When presented with an objection regarding unfair prejudice, we have been clear that a court must balance probative value

against unfair prejudice. See, *e.g.*, *United States v. Moore*, 641 F.3d 812, 822-23 (7th Cir. 2011). Had the district court admitted the evidence on Rule 404 grounds without any further elaboration, it would have been more difficult to identify the error as harmless. See, *e.g.*, *United States v. Ciesiolka*, 614 F.3d 347, 356-58 (7th Cir. 2010); *States v. Beasley*, 809 F.2d 1273, 1278-80 (7th Cir. 1987).

As direct evidence of obstruction, however, this evidence was unobjectionable. See *United States v. Cooper*, 591 F.3d 582, 590 (7th Cir. 2010) (applying harmless error analysis to evidentiary errors). McKibbins has not shown how the profile images caused significant prejudice to his case; though the number was great, and we realize that cumulative evidence can itself risk unfair prejudice under Rule 403, see *Old Chief*, 519 U.S. 179-80 (noting that cumulative evidence can be unfairly prejudicial), most of the profile photographs are benign. We can assume that the four "suspected" child pornography photographs were prejudicial in the literal sense. In this posture, however, it is hard to see how they were *unfairly* prejudicial on the obstruction charge, given that the cheerleading photo was located alongside these images and McKibbins was worried about the fact that he had been "receiving shit" online. More than the profile pictures, the images that might have depicted child pornography were powerful evidence of McKibbins's motive for obstruction.

In any harmless error analysis, we also consider the evidence the government had on the case generally. *United States v. Ochoa*, 229 F.3d 631, 640 (7th Cir. 2000).

Here, the other evidence was overwhelming. For the obstruction charge, the government had the actual phone conversations along with the warnings from McKibbins's family that he could be creating more trouble. The close temporal proximity between the detention hearing and his ill-conceived phone calls bolstered its case as well. For the incitement and travel charges, the government had months of instant messages, which were at times sexually explicit, and a seven-minute video of McKibbins masturbating into a webcam for "Ashley." McKibbins actually drove down to Illinois from Milwaukee with federal agents conducting surveillance of the trip, and the government caught McKibbins ready for his tryst with condoms. This evidence convinces us that any error from admitting the pictures did not affect his substantial rights and therefore must be disregarded as harmless. FED. R. CRIM. P. 52(a).

### III

While we find the error harmless and affirm McKibbins's conviction, we note in closing that the government could have made this case much simpler. It was unnecessary to flood the jury with the profile photographs; instead, the prosecutors could have made the point with a sample. This is not, we emphasize, a limitation on the government's discretion to try its case. We are making a more practical point: when juries are confronted with an avalanche of images in a case otherwise supported by such strong evidence, we are more likely

to worry that the line between fair and unfair prejudice has been crossed and that the government is just trying to prove the defendant is a "bad guy." This is especially true when, as here, the government argues that pornographic images convey an intent to molest a child. We have too often seen cases where the government blurs the line between possession of images and the more serious crimes charged in the indictment. See, *e.g.*, *United States v. Chambers*, 642 F.3d 588 (7th Cir. 2011). As we have noted, these issues require special attention in cases involving sex crimes generally, and even more so in cases involving crimes against minors, where the nature of the crime makes the propensity inference difficult to resist. See, *e.g.*, *United States v. Courtright*, 632 F.3d 363, 370 (7th Cir. 2011); *United States v. Cunningham*, 103 F.3d 553, 556-57 (7th Cir. 1996). Compare FED. R. EVID. 413-14 (permitting propensity evidence for certain sex crimes). In addition, we observe that a limiting instruction would have been useful here to clarify precisely what the photographs were being used for. That kind of guidance would have steered the jury away from the propensity inference it might otherwise have used.

The judgment of the district court is AFFIRMED.