# United States Court of Appeals for the Federal Circuit

---

**JOHN C. PARKINSON,**
*Petitioner*

**v.**

**DEPARTMENT OF JUSTICE,**
*Respondent*

---

2015-3066

---

Petition for review of the Merit Systems Protection Board in No. SF-0752-13-0032-I-2.

---

Decided: February 29, 2016

---

KATHLEEN M. MCCLELLAN, Government Accountability Project, Washington, DC, argued for petitioner. Also represented by JESSELYN A. RADACK.

MELISSA M. DEVINE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by ELIZABETH M. HOSFORD, ROBERT E. KIRSCHMAN, JR., BENJAMIN C. MIZER.

---

Before TARANTO, PLAGER, and LINN, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* LINN.

Opinion dissenting-in-part filed by *Circuit Judge* TARANTO.

LINN, *Circuit Judge.*

Lt. Col. John C. Parkinson ("Parkinson"), a preference eligible veteran, appeals from a final decision of the Merit Systems Protection Board ("Board" or "MSPB") sustaining his removal as a Special Agent at the Federal Bureau of Investigation ("FBI") for lack of candor under oath in violation of FBI Offense Code 2.6, and obstruction of process of the Office of Professional Responsibility ("OPR") in violation of FBI Offense Code 2.11. *Parkinson v. Dep't of Justice*, No. SF-0752-13-0032-I-2 (M.S.P.B. Oct. 24, 2013). The Board assumed jurisdiction under 5 U.S.C. §§ 7513(d), 7511(b)(8) and 7701, and we have jurisdiction on appeal from the Board's final decision under 5 U.S.C. § 7703.

We sustain the obstruction charge, and the Board's dismissal of Parkinson's affirmative defense of violations of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"). Because the lack of candor charge is unsupported by substantial evidence, and because the Board improperly precluded Parkinson from raising an affirmative defense of whistleblower retaliation, we reverse-in-part and vacate-in-part the Board's decision and remand for consideration of Parkinson's whistleblower defense and, if necessary, the appropriate penalty.

## I. BACKGROUND

### A.  Parkinson and Facility Build-Out[1]

Parkinson served as a special agent with the Sacramento field office of the FBI.  Beginning in 2006, Parkinson served as the leader of a special operations group ("group" or "SOG"), and was tasked with relocating a previously compromised undercover facility.

In 2006, the FBI leased a facility from James Rodda ("Rodda"), who agreed to contribute $70,000 to be used for "construction, construction documents, permits and fees" ("tenant improvement funds").  Parkinson negotiated the terms of the lease on behalf of the FBI, and managed the tenant improvement funds.

In February of 2008, partway through the facility build-out, Parkinson met with Assistant Special Agent in Charge Gregory Cox ("Cox"), and made whistleblower-eligible disclosures, implicating two pilots involved with the group in misconduct.  In August 2008, Cox and Parkinson's immediate supervisor, Supervisory Special Agent Lucero ("Lucero"), issued Parkinson a low performance rating, removed him as group leader, and thereafter reassigned him to another field office.

Believing these acts to be retaliation for his February 2008 disclosure, Parkinson sent a letter to Senator Charles Grassley, who forwarded Parkinson's whistleblower reprisal allegations to the Department of Justice's Office of the Investigator General ("OIG") for investiga-

---

[1]  The detailed factual background herein is based on reports by the Office of the Inspector General ("OIG") and the Office of Professional Responsibility ("OPR"), the Board's opinion, and the testimony of record.  Except where indicated, these facts are not in dispute.

tion.  OIG, in turn, opened a whistleblower reprisal investigation.

## B.  OIG Investigation of Parkinson

In October 2008, Special Agent Robert Klimt ("Klimt") replaced Parkinson as group leader, and took over the management of the off-site build-out.  The OPR report describes Klimt's testimony with respect to the state of the facility build-out as Klimt found it: "the build-out had not been completed, there were no records concerning the build-out, there was no inventory for tools and equipment, and no building plans or permits."

In December 2008, Klimt requested from Rodda all receipts, invoices, and information relating to the tenant improvement funds used during the facility build-out. Rodda explained that the $70,000 in tenant improvement funds had been spent, and that Parkinson had requested, received, and spent an additional $7,000.  Rodda indicated that he would look for the requested receipts, but failed to provide them after repeated FBI requests over several months.

On August 6, 2009, Cox and the Sacramento Office of the FBI submitted a referral to investigate possible misuse of the tenant improvement funds.  The request was sent to the OIG, which began a misuse investigation shortly thereafter.

The OIG investigation included consideration of paper documents, interviews with Rodda, his office manager Barbara Rawls ("Rawls"), his bookkeeper Maureen Massara, each of Parkinson's supervisors in Sacramento, and multiple interviews with Parkinson.  Parkinson testified that until the Spring of 2010, he believed the interviews to be in connection with Parkinson's whistleblower reprisal complaint against the FBI leadership in Sacramento.

In November 2009, the OIG interviewed Rodda, who provided a Vendor Balance Detail report, listing all the tenant improvement expenses and hired vendors, and subsequently provided the OIG with all receipts and invoices to support the listed expenditures. The report indicated that Parkinson had spent $78,789.48 for tenant improvements. When the OIG asked Rodda why he had not provided the report and receipts to the FBI earlier, he first responded that the FBI agents "were being snoopy," but later stated that Parkinson "had told" him "not to provide them as the OIG would be coming and asking for them in the near future." J.A. 175. The characterization and import of Parkinson's communication to Rodda to withhold the receipts from the FBI is in dispute, and is described *infra* in connection to the lack of candor determination.

In April 2010, Rodda, Rawls, and Parkinson met to come to a "mutually agreed set of facts" with regard to a check written directly to Parkinson on July 12, 2007 for $1,215.67. J.A. 14. Parkinson took notes during the meeting, gave them to Rawls to type, and had Rodda sign the resulting statement. The statement indicated that the check was made out to Parkinson to pay for a subcontractor who would only accept payment in cash. Parkinson testified that "the document was created in response to the rampant rumors that were going through the Sacramento Division about possible misuse of funds [by Parkinson]," J.A. 759, and that he was trying to "defend [him]self against those accusations." J.A. 760. The statement explains: "I authorized this check to cover the cost of installing interior doors to the building. Upon completion of the door installation, the contractor who performed the work indicated that he required cash payment . . . . My bookkeeper was out of the office that day and, in light of my staff shortage, Mr. Parkinson took the check to my bank to acquire the cash to pay the contractor." J.A. 171–72. Rodda confirmed in a later interview that the infor-

mation in the statement appeared to be correct, but that he could not verify the specific details. The OIG report noted that on June 17, 2010, two months after the meeting took place, neither Rodda nor Rawls could recall what the check was for. The Board determined that as of April 2010, Parkinson "anticipated that OIG would be investigating his handling of the build-out." J.A. 15.

Throughout 2009, and until May 2010, Parkinson was interviewed repeatedly by OIG officials. In Spring 2010, Rodda told Parkinson that he believed the OIG was targeting Parkinson, and not just investigating Parkinson's whistleblower complaint. In a May 2010 interview, OIG confirmed to Parkinson that he was indeed the target of its investigation concerning the tenant improvement funds.

In the course of the interviews, Parkinson made two groups of statements that are particularly relevant to the instant case. First, the OIG investigator, David Loftus, asked, "what were considered tenant improvement items that [Rodda,] the owner of the [group] off-site was to pay for? . . . . What was that supposed to be for, the improvements?" and Parkinson answered, "Let me be very clear on this point. Nothing was done with any of the tenant improvement funds that was not approved by [Rodda]." J.A. 635.

Second, Parkinson was asked several times about his communication to Rodda about his desire that Rodda provide the receipts to the OIG and withhold them from the FBI. The relevant colloquies are reproduced below:

Q: Did you instruct [Rodda] not to provide [the FBI] with receipts?

A: I instructed [Rodda] to provide those to the Office of the Inspector General.

. . .

Q: [D]id you tell [Rodda] not to provide receipts to the FBI? It's a simple yes or no.

A: I asked him not to do that.

Q: Okay. So you told him not to provide receipts to us, I mean to the FBI?

A: I didn't tell him. I asked him not to.

Q: You asked him not to? And what was your purpose for that?

A: Because my situation was having invoked the protections of the Whistleblower Protection Act . . . [a]nd I necessarily wanted OIG to be the fair arbiter of that.

. . .

A: No, no, I don't feel like I have the authority to tell anyone anything with regard to this.

Q: Well, you did.

A: No, I asked [Rodda] to provide the information to the OIG rather than FBI management.

. . .

A: I did not instruct [Rodda] to refuse to do it, in terms of providing it to the FBI. I advised him that those were his private business documents.

. . .

Q: . . . How are those records his private records that he is not to share with FBI, who has entered into an agreement with him? If he's not paying that money, if he has paid nothing, FBI could pull out of the lease. They have every right to see it. I don't know why you're classifying this as his private records?

A: I can't agree with you on this point because, as a private businessman, a private person, issuing funds that are his personal funds to improve his building, which he owns [in] fee simple, that is solely his business.

J.A. 709–713.

## C. Procedural History and Parkinson's Challenges

The OIG sent the FBI its report of factual findings, and the OPR thereafter issued its own report, and proposed Parkinson's dismissal. The OPR report concluded that a preponderance of the evidence substantiated four offenses: 1) theft under FBI Offense Code 4.5 for removal of furniture from the offsite location[2]; 2) obstruction of the OPR process under FBI Offense Code 2.11 for creating the April 2010 "mutual recollection" document for Rodda's signature; 3) unprofessional conduct on duty under FBI Offense Code 5.22 for (a) instructing Rodda and Rawls not to provide the receipts to the FBI, (b) signing a false purchase agreement for the removal of furniture from the off-site, (c) spending tenant improvement funds for non-construction related expenses, (d) using cash to pay a laborer; and 4) lack of candor under FBI Offense Code 2.6 for statements made during the OIG investigation, reproduced *supra* at 6–8, concerning: (a) distinguishing between advising and telling Rodda and Rawls not to provide the FBI with the receipts; (b) asserting that Rodda approved all statements—without explaining that

---

[2]    Part of the tenant improvement funds were used to purchase furniture, which Parkinson removed to another of Rodda's warehouses to secure from access by persons who were the subject of his original whistleblower disclosure.   Because the Board did not sustain this charge, *see infra*, we need not and do not further address it.

Rodda ratified the statements only afterwards; (c) asserting that the statement signed by Rodda regarding the check made out to Parkinson was a "mutual recollection" while neither Rawls nor Rodda could remember the purpose of the check two months later; and (d) statements made about furniture removed from the SOG site.

The OPR thereafter proposed to dismiss Parkinson for the theft (FBI Offense Code 4.5), unprofessional conduct while on duty (FBI Offense Code 5.22), and lack of candor (FBI Offense Code 2.6) charges, but did not impose a separate sanction for the obstruction of the OPR process charge (FBI Offense Code 2.11). OPR considered the *Douglas* factors, Parkinson's prior history of misusing a government credit card to make $2,500 in personal purchases, and aggravating and mitigating circumstances for each of the offenses, and concluded that dismissal was the appropriate penalty. The FBI thereafter dismissed Parkinson pursuant to the OPR report, and Parkinson appealed to the Board.

The Board affirmed the AJ's dismissal of Parkinson's whistleblower and USERRA affirmative defenses, relying on its prior decision in *Van Lancker v. Department of Justice*, 119 M.S.P.R. 514 (2013) that FBI agents were not entitled to such affirmative defenses under 5 U.S.C. § 7701(c)(2)(B) because the FBI is excluded from the definition of agency in 5 U.S.C. § 2302.

The Board did not sustain the theft charge because Parkinson did not have the specific intent required, and did not sustain the unprofessional conduct charge because Parkinson was not on duty during the alleged misconduct. The Board did sustain the obstruction charge because Parkinson "met with potential witnesses to ensure that they had their stories straight, and he persuaded a key witness to lock in his story by committing it to writing," with the result that the OIG could not obtain Rodda's and Rawls's "untainted recollection of events, but rather their

recollection as affected by the appellant's efforts." J.A. 14. Though it concluded that "[t]he agency did not prove that the written statement he drafted for the landlord was incorrect or that he asked the landlord to lie about anything," J.A. 16, the Board decided that success in obstruction is not required to sustain the charge. The Board did not sustain the lack of candor charge for two of the specifications—holding that Parkinson did not lack candor in stating that the April 2010 document was a "mutual recollection[,]" and that Parkinson did not lack candor with regard to the reasons for his moving of the furniture. It did sustain the other two specifications—that Parkinson lacked candor by distinguishing between "telling" and "asking" Rodda and Rawls not to provide the receipts to the FBI, and that Parkinson lacked candor by failing to explain that Rodda's approval was in the form of ratification, not pre-expense approval.

Despite its dismissal of several of the charges, the Board sustained the OPR's removal penalty. The Board reconsidered the *Douglas* factors, noted the unique responsibilities of FBI agents, again considered the aggravating circumstance of Parkinson's prior disciplinary record, the mitigating circumstance of Parkinson's prior record of military and FBI service, and that Parkinson believed he was the victim of improper whistleblower retaliation. The Board noted that many past removal cases "involved more egregious acts of falsification than the mischaracterizations or half-truths at issue here," but the Board nevertheless approved the removal penalty. The full Board on review added some analysis, adopted the initial decision, and came to the same conclusion. The agency did not appeal the overruled charges. Parkinson timely appealed the sustained charges.

## II. Discussion

### A. Standard of Review and Burdens of Proof

We may set aside the Board's decision only where the Board's actions are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). Credibility determinations by the Board are "virtually unreviewable." *Hambsch v. Dep't of Treasury*, 796 F.2d 430, 436 (Fed. Cir. 1986). We review the Board's statutory interpretations de novo. *Weatherby v. Dep't of Interior*, 466 F.3d 1379, 1383 (Fed. Cir. 2006).

The Agency has the burden to show that removal of an employee will "promote the efficiency of the service." *Doe v. Dep't of Justice*, 565 F.3d 1375, 1379 (Fed. Cir. 2009) (citing 5 U.S.C. § 7513(a)).

### B. Obstruction of the OPR Process

FBI Offense Code 2.11 prohibits "taking any action to influence, intimidate, impede or otherwise obstruct the OPR process." The Board held that Parkinson obstructed the OPR process in crafting the mutual recollection document, categorizing Parkinson's action as meeting with "potential witnesses to ensure that they had their stories straight," and convincing "a key witness to lock in his story by committing it to writing." J.A. 14. The Board explained that the obstruction was in preventing the OIG from acquiring Rodda's untainted recollection. There was no evidence that Rodda's testimony regarding the check was altered by the meeting or the document.

We agree that the Board's determination was supported by substantial evidence. There is no dispute that Parkinson did in fact meet with Rodda and Rawls, that he prepared the statement from his notes, and that he asked Rawls to type it and Rodda to sign it. Indeed, Parkinson

testified that his motivation for the meeting and for creating the document was "to clarify the expenditure in light of the false accusation Sacramento management was levying against me that I had stole[n] $77,000 of Mr. Rodda's money." J.A. 758. The document was thus intended to improperly influence the investigation that he believed would arise from the Sacramento office's accusation.

Parkinson offers two unconvincing arguments against this charge. First, that as of April 2010, he did not know of the OPR investigation into his actions, and cites *United States v. Aguilar*, 515 U.S. 593 (1995) and *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) for the proposition that knowledge of a particular proceeding (not an "ancillary proceeding") is necessary to support a charge of obstructing that proceeding. *Aguilar* was not interpreting FBI Offense Code 2.11, and did not purport to set overarching rules for all obstruction-based offenses, particularly as the language of the criminal statute at-issue in that case was critical to the decision, *see* 515 U.S. at 598–600. *Arthur Andersen* also cannot stand for the broad proposition Parkinson asserts; that case interpreted a different criminal statute and required only that the proceeding was "foreseeable" to support an obstruction charge. 544 U.S. at 708.

Parkinson does not dispute that he knew about the OIG investigation as of April 2010, and indeed argued to the Board that he "was trying to facilitate—not obstruct— the OIG's investigation," J.A. 958–59, by meeting with Rodda and Rawls. Moreover, in his briefs to the Board, Parkinson explained that in April 2010 "Mr. Parkinson *did* believe the OIG would look into the build-out, in the context of conducting an investigation into Mr. Parkinson's whistleblower reprisal complaint." J.A. 958–59. Parkinson admitted that the reason for the April 2010 meeting—"to clarify the expenditure in light of the false accusation Sacramento management *was levying against*

*me* that I had stole[n] $77,000 of Mr. Rodda's money," J.A. 758—was directly related to the anticipated OPR proceeding. This is sufficient to establish the nexus between the obstruction and the proceeding; the OIG investigation here was not "ancillary" to the OPR process.

Second, Parkinson argues that because Rodda later testified that the April 2010 statement was true, he cannot be said to have obstructed the OPR process. FBI Offense Code 2.11 does not require a showing that the action taken *in fact* influences the OPR process—it requires only that actions are taken for proscribed purposes. Parkinson's admission that he wanted to "clarify the expenditures in light of the false accusation Sacramento management was levying against me" provides substantial evidence to support the charge that he was trying to improperly influence the OPR process, which is all that is required.[3]

## C. Lack of Candor

Parkinson was charged with "lack[ing] candor under oath in violation of FBI Offense Code 2.6 (Lack of Can-

---

[3] Parkinson does not argue on appeal that the Board applied a standard that lacked any requirement of impropriety in the attempted influence. Such a requirement is implicit in the FBI Offense Code 2.11, given the other words following "influence" and given that even candid action aimed at persuasion would be covered by "influence" if read without a requirement of impropriety. *Cf. Arthur Andersen*, 544 U.S. at 703–04 (reciting legitimate reasons for persuading others to withhold evidence, thus stressing the importance of the "corruptly persuad[ing]" requirement for criminal obstruction under 18 U.S.C. § 1512). Clarity would be served if the Offense Code language were modified to reflect the implicit requirement.

dor/Lying Under Oath)." FBI Offense Code 2.6 provides for dismissal when an employee "[k]knowingly provid[es] false information in a verbal or written statement made under oath." "False information" is further defined, *inter alia*, as "false statements; misrepresentations; the failure to be fully forthright; or the concealment or omission of a material fact/information."

In *Ludlum v. Department of Justice*, 278 F.3d 1280, 1284 (Fed. Cir. 2002), this court explained that lack of candor and falsification are distinct charges. While falsification "involves an affirmative misrepresentation and requires intent to deceive," *id.* at 1284 (citing *Naekel v. Dep't of Transp.*, 782 F.2d 975, 977 (Fed. Cir. 1986)), lack of candor "is a broader and more flexible concept whose contours and elements depend upon the particular context and conduct involved," *id.* We explained that "lack of candor is established by showing that the FBI agent did not 'respond fully and truthfully' to the questions he was asked . . . . *Although lack of candor necessarily involves an element of deception*, 'intent to deceive' is not a separate element of that offense—as it is for 'falsification.'" *Id.* at 1284–85 (emphasis added).

In the context of FBI Offense Code 2.6, we understand this "element of deception" to mean that the "failure to be fully forthright" must be done "knowingly." Indeed, this was the distinction that ultimately led this court to affirm the Board's decision in *Ludlum*: "the gross disparity between the three instances [of transporting unauthorized persons in a Bureau vehicle] he first admitted and the twelve to fourteen additional instances he admitted [to] a month later indicates *he must have known* it was substantially more than three," *id.* at 1285–86 (emphasis added), and Ludlum's "later explanation for his earlier failure to mention these additional instances—'fear of causing me further problems'—demonstrated that he was less than candid in his [earlier] statement," *id.* at 1286. Though

lack of candor is distinct from falsification in that it does not require a showing of an "intent to deceive," *id.* at 1284–85, it nevertheless requires that information is conveyed "knowing" that such information is incomplete.

### 1. Characterization of Statements to Rodda Not to Provide Receipts to the FBI

Lack of candor, as relevant here, requires proof of two elements: that the employee failed to be fully forthright, and that the employee did so knowingly. Even assuming that Parkinson failed to be fully forthright, there is no substantial evidence that this failure was done "knowingly."

First, the Board found that Parkinson's statement, "I didn't tell him, I *asked* him not to [provide the receipts]" was "not accurate," J.A. 20, because Parkinson later stated that he "*directed* [Rodda] to provide the documents to OIG rather than—or not the FBI," and Rodda testified that "[w]e got the impression that . . . we should give it to the OIG and not the FBI." J.A. 20–21. The distinction between "asked" and "directed" was itself the only basis for the Board's inference that Parkinson "was trying to minimize his culpability by suggesting he had done something of far less concern." J.A. 22. According to the Board, "[i]n drawing a distinction between *telling* and *asking*, it appears that the appellant was trying to convey the impression that he did not have much control or influence over what the landlord did." J.A. 21. The Board concluded that "in the absence of any other plausible explanation for his mischaracterization . . . the appellant made it to deceive OIG about what had happened." J.A. 22.

The distinction between the two characterizations is not enough to allow an inference that the characterization was done knowingly, because the statements can well be read to convey the same message in different words: that

Parkinson wanted the receipts to go to the OIG rather than the FBI. Indeed, Rodda later explained his statement that Parkinson "told" him not to provide the receipts, saying that "Parkinson *asked* him" not to provide the receipts (quoted from the OIG report), "advised him to not give the FBI any documentation" (quoted from the OIG report), and "I think Parkinson didn't trust the FBI hierarchy, and he *requested* me to hold all documents until [the] OIG asked for them." J.A. 176 (Rodda being quoted by OIG report, emphases added). Moreover, the OIG report concluded that "Parkinson hindered the Sacramento Division's attempts to determine how the SOG offsite tenant improvement funds were spent by *asking* [Rodda] and those working for him not to provide that information to the FBI." J.A. 177. The interchangeable use of words of direction and words of request by Rodda, the OIG, and Parkinson shows that Parkinson's choice of words in explaining the communication provides no foundation upon which to infer that he knowingly lacked candor.

Moreover, Parkinson explained that the reason for his insistence on the distinction was his understanding that it was not his place to tell Rodda what to do with Rodda's own documents:

A: No, no, I don't feel like I have the authority to tell anyone anything with regard to this.

Q: Well, you did.

A: No, I asked [Rodda] to provide the information to the OIG rather than FBI management.

. . .

A: I did not instruct [Rodda] to refuse to do it, in terms of providing it to the FBI. I advised him that those were his private business documents. . . .

. . .

Q: . . . How are those records his private records that he is not to share with FBI, who has entered into an agreement with him? If he's not paying that money, if he has paid nothing, FBI could pull out of the lease. They have every right to see it. I don't know why you're classifying this as his private records?

A: I can't agree with you on this point because, as a private businessman, a private person, issuing funds that are his personal funds to improve his building, which he owns [in] fee simple, that is solely his business."

J.A. 711–13. No evidence contradicts that this was Parkinson's reason for insisting on the distinction. The Board's simple disbelief of Parkinson is not sufficient to thus conclude that Parkinson knew he was not being forthright and complete.

To be clear, the issue is not whether he, in fact, asked or told Rodda to withhold the receipts. The issue is whether the choice of words in these circumstances is alone enough to meet the agency's burden of showing that Parkinson "knowingly" failed to be fully forthright. It is not.

We thus hold that the lack of candor charge with respect to the ask/tell distinction is unsupported by substantial evidence.

### 2. Pre-Approval/Ratification

The Board found that Parkinson exhibited a lack of candor when he testified that: "Nothing was done with any of the tenant improvement funds that was not approved by [Rodda]." *See* J.A. 635. The Board so held because it concluded that the statement "provides an appearance of pre-approval by the landlord of the expens-

es," and "for the appellant's statement to OIG to have been accurate and complete, he would have had to explain the approvals were after-the-fact ratifications, not explicit pre-expenditure authorizations to spend the funds in particular ways." With little further analysis, the Board found that "in the absence of any other plausible explanation for his misstatement . . . the appellant made it to deceive OIG about the extent of the landlord's involvement in approving the expenditures."

The problem with the Board's analysis of Parkinson's state of mind is two-fold. First, the context of the question was *whether* Rodda approved the expenses, not *when* he did so. Parkinson's use of "approved" in that context instead of "ratified" is thus not enough to prove the necessary element of a knowing failure to be forthright. Second, "approved" is a generic way of saying "pre-approved or ratified," and Parkinson's statement could thus be read to be wholly accurate. Though this does not necessarily preclude a finding of a lack of candor based on other evidence of the speaker's state of mind, the use of the generic term does not alone provide substantial evidence that Parkinson "knowingly" failed to be forthright.

We thus hold that the lack of candor charge with respect to the pre-approval/ratification distinction is unsupported by substantial evidence.

### D.  Availability of Judicial Review of Parkinson's USERRA and Whistleblower Claims

It is undisputed in this case that Parkinson has no right to assert before the Board an individual right of action under the Whistleblower Protection Act, 5 U.S.C. § 1201 *et seq.*, or the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301 *et seq.* The issue here is whether a preference eligible FBI agent with the right to appeal an adverse personnel action before the Board is foreclosed from asserting USERRA violations and whistleblower reprisal

as affirmative defenses in such an appeal to the Board. These are issues of first impression in this court.

There is no dispute in this case that the Board has jurisdiction to consider the propriety of Parkinson's removal by the FBI as a whole. The chain of statutes creating this jurisdiction, and defining allowable affirmative defenses is as follows. Title 5, section 7513(a) allows an "agency" to "take an action covered by this subchapter [(titled "Removal, Suspension for More than 14 Days, Reduction in Grade or Pay, or Furlough for 30 Days or Less")] against an employee only for such cause as will promote the efficiency of the service." That same section creates a judicial enforcement mechanism for this provision, by providing that "An employee against whom an action is taken under this section is entitled to appeal to the Merit Systems Protection Board under section 7701 of this title." 5 U.S.C. § 7513(d).

Most FBI personnel are *not* afforded this judicial enforcement mechanism because § 7511(b) states: "This subchapter does not apply to an employee . . . (8) whose position is within the . . . Federal Bureau of Investigation." However, the statute voids the exception for employees of the FBI for whom "subsection [5 U.S.C. § 7511(a)(1)(B)] of this section . . . is the basis for this subchapter's applicability." 5 U.S.C. § 7511(b)(8). Section 7511(a)(1)(B) defines an Employee as "a preference eligible in the excepted service who has completed 1 year of current continuous service in the same or similar position[]—(i) in an Executive Agency."[4] In other words, preference eligible FBI employees against whom adverse employment action has been taken may appeal such action to the Board, though non-preference eligible FBI employees do not have such a right.

---

[4] It is undisputed that the FBI is "an Executive Agency" for purposes of this subchapter.

Title 5, U.S. Code, section 7701, the Board's general jurisdictional statute, provides that "[a]n employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation." The Board may sustain the agency decision: "Subject to paragraph (2) of this subsection . . . only if the agency's decision . . . (B) . . . is supported by a preponderance of the evidence." 5 U.S.C. § 7701(c)(1). This section forms the basis of Parkinson's challenges to the factual bases of the lack of candor and obstruction of the OPR process charges above.

Paragraph (2) goes on to *preclude* the Board from sustaining agency decisions as follows:

(2) Notwithstanding [5 U.S.C. § 7701(c)] paragraph (1), the agency's decision may not be sustained under subsection (b) of this section if the employee or applicant for employment –

. . .

(B) shows that the decision was based on any prohibited personnel practice described in section 2302(b) of this title; or

(C) shows that the decision was not in accordance with law.

5 U.S.C. § 7701(c)(2).[5] The Government and Parkinson agree that this section generally allows petitioners to

---

[5]    Section § 7701(c)(2)(B) uses the phrase "prohibited personnel practice described in section 2302(b)," and section 2302(b) uses the phrase "personnel action." Section 2302(a)(1) defines "prohibited personnel practice" as "any action described in subsection (b)." Neither Parkinson nor the Government distinguishes between the phrases "personnel practice" and "personnel action."

assert certain affirmative defenses to contest agency personnel decisions. The parties disagree whether Parkinson, as an FBI agent, can assert the Whistleblower Protection Act and USERRA rights as affirmative defenses under §§ 7701(c)(2)(B) or (C).

The relevant whistleblower protections are codified, *inter alia*, in 5 U.S.C. § 2302(b) (emphasis added): "Any employee who has authority to take, direct others to take, recommend, or approve any *personnel action*, shall not, with respect to such authority . . . (8) take or fail to take, or threaten to take or fail to take, *personnel action* with respect to any employee or applicant for employment because of (A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences (i) any violation of any law, rule, or regulation . . . [or] (11)(A) knowingly take, recommend, or approve any *personnel action* if the taking of such action would violate a veterans' preference requirement." Section 2302(a)(2)(A) (emphasis added) defines a "personnel action" as, *inter alia*, "(iii) an action under chapter 75 of this title or other disciplinary or corrective action [including removal]. . . with respect to an employee in, or applicant for, a covered position *in an agency*." In turn, section 2302(a)(2)(C) (emphasis added) defines "agency" as "an Executive Agency and the Government Publishing Office, but *does not include . . .* the Federal Bureau of Investigation."

A divided Board here dismissed Parkinson's whistleblower reprisal and USERRA affirmative defenses, relying on its previous decision in *Van Lancker v. Department of Justice*, 119 M.S.P.R. 514 (2013). In *Van Lancker*, another divided Board dismissed a preference eligible FBI agent's affirmative defense of whistleblower retaliation, holding that "The FBI is specifically excluded from coverage under 5 U.S.C. § 2302, and therefore the reference to 2302(b) in section 7701(c) is inapplicable to FBI employees." 119 M.S.P.R. at 517. The Board reasoned that

Congress could have carved out an exception to the prohibition in § 2302 for preference eligible employees, or "refrain[ed] from referencing section 2302(b) exclusively in section 7701(c)(2)(B)" in defining a prohibited personnel practice. *Id.* at 517–18. Finally, the Board distinguished cases where it had allowed affirmative defenses of whistleblower reprisal by preference eligible Postal Service employees—though those employees too are generally excluded from coverage under § 2302. It distinguished Postal Service and FBI employees because of the likelihood of sensitive information being revealed with respect to FBI whistleblowers and Congressional intent that FBI whistleblower claims be resolved internally, as manifested by Congress's creation of § 2303 to provide a separate internal enforcement mechanism for whistleblower claims by FBI agents. *See id.* at 518–19 (discussing *Mack v. U.S.P.S.*, 48 M.S.P.R. 617 (1991) and *Butler v. U.S.P.S.*, 10 M.S.P.R. 45 (1982)). The Board here added that § 7701(c)(2)(C) could not allow Parkinson's whistleblower affirmative defense because, though whistleblower retaliation against FBI employees generally is not in accordance with the law under § 2303, the Board has no review authority over violations of that section in whatever posture presented.

Vice Chairman Wagner filed dissenting opinions in both *Van Lancker* and in this case. In *Van Lancker*, Vice Chairman Wagner argued that "the existence of section 2302 does not justify disregarding the holdings in *Butler* and *Mack*," since both the Postal Service and the FBI are excluded from individual causes of action under § 2302 and both have internal procedures for enforcement of whistleblower retaliation claims. *Van Lancker*, 119 M.S.P.R. at 524–25. Vice Chairman Wagner reiterated that position in her dissent in this case.

Parkinson argues that: 1) *Van Lancker* was wrongly decided because the exclusion of the FBI as an "agency" in § 2302(a) only applies to claims made under § 2302 and

not to affirmative defenses where the Board otherwise has jurisdiction over the personnel action; 2) there is no principled way to distinguish Parkinson's case from the preference eligible postal workers in *Mack* and *Butler*; and 3) the "not in accordance with law" provision in § 7701(c)(2)(C) may use the prohibition against whistleblower retaliation at the FBI found in § 2303 and against USERRA violations at the FBI found in 38 U.S.C. § 4325 as affirmative defenses.

### 1. Whistleblower Retaliation Defense

With regard to his whistleblower defense, we agree with Parkinson. As a preference eligible FBI agent, Parkinson was an "employee" under § 7511, with the right to appeal his removal to the Board under 5 U.S.C. §§ 7513(d) and 7701. Section 7701(c)(2)(C) unambiguously provides, *inter alia*, that "the agency's decision may not be sustained under subsection (b) of this section if the employee . . . (C) shows that the decision was not in accordance with law."

Section 2303 unambiguously prohibits whistleblower reprisal at the FBI:

> Any employee of the Federal Bureau of Investigation . . . shall not . . . take or fail to take any personnel action with respect to any employee of the Bureau as reprisal for a disclosure of information by the employee to the Attorney General (or an employee designated by the Attorney General for such purpose) which the employee or applicant reasonably believes evidences – (1) a violation of any law, rule, or regulation.

5 U.S.C. § 2303(a). The statute goes on to define "personnel action" as "any action described in clauses (i) through (x) of section 2302(a)(2)(A) of this title with respect to an employee in, or applicant for, a position in the Bureau." *Id.* Section 2302(a)(2)(A)(iii) covers adverse actions under

chapter 75, such as the removal taken here against Parkinson. Thus, if Parkinson was removed in reprisal for his whistleblowing disclosures, his removal would be "not in accordance with law," and the Board would be statutorily prohibited from sustaining the agency's decision to remove Parkinson.

The only issue is whether the creation of an FBI-specific enforcement mechanism for whistleblower retaliation in § 2303 preempts the availability of an affirmative defense of whistleblower retaliation by a preference eligible FBI employee before the MSPB.

The Government offers three arguments why it does. First, the Government emphasizes that the statutory language in § 7701(c)(2)(B) does not support a distinction between individual causes of action and affirmative defenses. In either case, the FBI is not an "agency" and is thus incapable of taking "personnel action" under 5 U.S.C § 2302(a). Thus, the Government argues, Parkinson cannot show that the FBI's removal decision "was based on any prohibited personnel practice described in section 2302(b)" for purposes of 5 U.S.C. § 7701(c)(2)(B), even as an affirmative defense. The Government notes that the Supreme Court has stated that Congress exempted the FBI from "the requirements of Section 2302(b)(8)(A) entirely," *Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 923–24 (2015). Even assuming without deciding that the reference in § 7701(c)(2)(B) to "prohibited personnel practice described in section 2302(b)" necessarily excludes Parkinson's *affirmative defenses*, such a determination does not undermine Parkinson's argument under § 7701(c)(2)(C) that his removal was not in accordance with the whistleblower law directly applicable to FBI personnel, i.e., § 2303.

Second, the Government argues that § 7701(c)(2)(C), as a general "catch-all" provision, cannot "evade [§ 7701(c)(2)(C)'s] clear limitations to section 2302,"

because, as a general rule, the "specific [statutory provision] governs the general [statutory provision], as explained in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). Section 7701(c)(2)(B) and (C) do not stand in a specific/general relation to one another with respect to the FBI. If it is true, as the Government argues, that the FBI is incapable of taking a prohibited personal action under § 2302(b), then § 7701(c)(2)(B) says nothing about affirmative defenses available to FBI employees, and there can be no conflict between the "specific" provision of § 7701(c)(2)(B) and the "general" provision of § 7701(c)(2)(C). The FBI's exclusion from the definition of an "agency" in § 2302(a)(2)(A) does not mean that an FBI decision based on the prohibited personnel practices described in § 2302(b) would thus be in accordance with law. To the contrary, as evidenced by § 2303, the prohibited personnel practices at issue here are prohibited by law at the FBI. In other words, although the FBI is excluded from the scope of § 7701(c)(2)(B), that subsection does not prohibit the applicability of § 7701(c)(2)(C) to the FBI.

Finally, the Government argues that even if § 7701(c)(2)(C) could be used as a basis for Parkinson's affirmative defense, § 2303 cannot form the predicate violation of law because that section gives the Attorney General the power to promulgate regulations to prevent whistleblower reprisals, and gives the President the power to enforce § 2303, and these powers are to be exercised in a way that did not provide for judicial review with the Board and this court. In other words, the Government argues that the Department of Justice regulations promulgated under § 2303(b)—creating a non-judicial resolution mechanism of whistleblower retaliation claims at the FBI—preempt the right of preference eligible FBI employees from asserting whistleblower retaliation as an affirmative defense under § 7701(c)(2)(C). The Government also argues that whistleblower reprisal claims by

employees in the intelligence community raise serious security concerns, as the Board held in *Van Lancker*, and allowing such defenses at the Board and this court violates the Congressional intent in § 2303 to resolve those claims within the Department of Justice. This is roughly the argument accepted by the dissent-in-part, "that a sufficiently specific remedial regime can displace an otherwise-available general remedy whose application would impair policies evident in the specific remedial provisions." Dissent-in-part at 3 (citing cases).

This argument is ultimately unconvincing because it fails to appreciate the distinct rights Congress provided to preference eligible and non-preference eligible FBI employees. As discussed *supra*, most FBI employees have no right of appeal to the Board under 5 U.S.C. §§ 7701(a), 7513(a), and 7513(d) by virtue of the exclusion of FBI employees from the definition of "employees" under 5 U.S.C. § 7511(b)(8). As such, 28 C.F.R. § 27 provides an important, and potentially exclusive, procedure for most FBI employees to resolve whistleblower retaliation-motivated agency actions. Preference eligible FBI employees, however, *do* have a right of review over certain adverse agency action to the Board, and such employees are explicitly protected from action that is taken "not in accordance with law." Neither the Government nor the dissent explain how the existence of internal FBI procedures for resolving whistleblower retaliation undermines this statutory right. Section 2303 gives to the Attorney General the responsibility of prescribing regulations "to ensure that such personnel action shall not be taken against an employee of the Bureau as a reprisal for any disclosure of information described in subsection (a) of this section," and gives to the President the responsibility to "provide for the enforcement of this section in a manner consistent with applicable provisions of sections 1214 and 1221 of this title." 5 U.S.C. § 2303. Although the promulgated regulations do not provide for judicial review, *see* 28

C.F.R. §§ 27.1–27.5, nothing in the statute prohibits judicial review of whistleblower retaliation claims when presented as affirmative defenses under a separate statute providing for such review in cases affecting preference eligible FBI employees.

This is not a situation where the statutory scheme evidences a clear Congressional intent to exclude whistleblower affirmative defenses from judicial review. *See e.g., United States v. Fausto*, 484 U.S. 439, 452 (1988) (considering the effect of the Civil Service Reform Act of 1978, including 5 U.S.C. §§ 7701, 7511 and 7513, on the appeal rights of non-preference eligible employees in the excepted service). To the extent that the FBI's exclusion from § 2302(b) evidences a Congressional intent to exclude the actions of at least some FBI employees from judicial review, *cf. MacLean*, 135 S. Ct. at 923–24 (noting in dicta that Congress exempted the FBI from "the requirements of Section 2302(b)(8)(A) entirely"),[6] such a determination is more than balanced by the Congressional intent evinced by the explicit statutory right given to preference eligible FBI agents to have adverse employment actions judicially reviewed and to allow affirmative defenses based on violations of law presented during such a review.

---

[6]   *MacLean* concerned a Department of Homeland Security employee's eligibility to challenge his removal under 5 U.S.C. § 2302(b)(8) for making disclosures of sensitive information. Unlike the FBI, Homeland Security is *not* one of the agencies listed in 5 U.S.C. § 2302(a)(2)(C)(ii)(I), and the issue was whether an exception withholding whistleblower protection for statements prohibited by law extends to statements prohibited by regulation. The availability of an affirmative defense to a preference eligible FBI employee under 5 U.S.C. § 7701(c)(2)(C) or § 7701(c)(2)(B) was simply not at issue in that case.

Section 7701(c)(2)(C) does not exclude FBI employees, and § 2303 does not prohibit judicial review. In the absence of a clearer Congressional mandate, and in light of Congress's solicitous treatment of preference eligible FBI employees, we decline the Government's invitation to read § 2303 to impliedly overrule the explicit statutory availability of affirmative defenses under § 7701(c)(2)(C).

The legislative history of the 1978 Act manifests an intention that the appeal rights of preference eligible FBI agents be grouped with other preference eligibles rather than other FBI employees. Title 5, Sections 7701, 7511, 7513, 2302, and 2303 were all part of the Civil Service Reform Act of 1978. That Act abolished the Civil Service Commission, and assigned its adjudicative functions to the Merit Systems Protection Board. S. Rep. 95-969, at 5 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 2723, 2727. At that time, preference eligible veterans, including preference eligible FBI employees, already had the right to appeal their removal to the Civil Service Commission under Section 14 the Veterans' Preference Act of 1944, 58 Stat. 390, as amended 61 Stat. 723 ("[A] preference eligible . . . shall have the right to appeal to the Civil Service Commission from an adverse decision of the administrative officer."). Preference eligible FBI agents could exercise this right just as well as preference eligible employees of other agencies. *See id.* (granting appeal rights to preference eligible employees "in any establishment, agency, bureau, administration, project, or department" without qualification on agency); *Chastain v. Kelley*, 510 F.2d 1232, 1236 (D.C. Cir. 1975) (discussing preference eligible FBI agent's rights under the Veterans Preference Act). *Cf. Carter v. United States*, 407 F.2d 1238, 1242 & n.3 (D.C. Cir. 1968) ("Because of the exemption of the FBI from the civil service laws, the Bureau is generally free to discharge its employees for any reasons it chooses," but "like any other employer, the FBI is subject to the provisions of § 9(c) of the Universal Military Training and

Service Act by which Congress granted special rights and protections to the returning veteran," though that agent could not appeal to the Civil Service Commission because he was not preference eligible).

The focus of the 1978 Act was to expand the procedural and substantive employment rights of non-preference eligible members of the excepted service. H.R. Rep. No. 101-328, at 3, *as reprinted in* 1990 U.S.C.C.A.N. 695, 697 ("The key difference between the protections available to competitive service employees and preference eligibles in the excepted service, on the one hand, and excepted service employees who are not preference eligibles, on the other, is the right to appeal an adverse action to the Merit Systems Protection Board for independent review. H.R. 3086 eliminates that difference."). The 1978 Act was not intended to restrict the rights of preference eligible employees at the FBI:

> The bill limits the procedural protections for employees of . . . the Federal Bureau of Investigation (FBI) . . . solely to preference eligibles, thereby preserving the status quo. The committee preserved the status quo in relation to the FBI and NSA because of their sensitive missions.

*Id.* at 699. *See also id.* at 697 ("An estimated 30 to 40 percent of the remaining 445,700 excepted service employees already have appeal rights because they are veterans preference eligible."). Although the Act did not *extend* Board appeal rights for FBI employees, nothing in the text or legislative history with respect to §§ 2302, 2303, 7511, 7513, or 7701 suggests that Congress intended to curtail rights already extant—such as those available to preference eligible employees. Congress maintained this right despite a clear recognition of the security concerns of doing so. This is in contrast to employees of "some agencies, such as the Central Intelligence Agency and the General Accounting Office, [where]

even veterans do not have appeal rights." *Id.* The FBI's exclusion from § 2302 and the creation of a separate offensive enforcement mechanism for FBI whistleblowers in § 2303 should thus not be read to undermine by implication rights already extant before 1978.

The dissent-in-part's cited cases are not to the contrary. For example, *United States v. Bormes*, 133 S.Ct. 12, 18 (2012) held that the Little Tucker Act is not available as a waiver of sovereign immunity because the Fair Credit Reporting Act (FCRA) "contains its own judicial remedies" for its violation. The case further held that the Little Tucker Act is available only where "no special remedy has been provided," and the FCRA created a detailed remedial scheme with particular rights, that was "plaintiff-specific," and "precisely defined the appropriate forum." *Id.* However, that case says nothing about the scope of proper adjudication where judicial review is already clearly available (under § 7513 and § 7701). In *RadLAX Gateway Hotel, LLC. v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012), the Supreme Court addressed the interaction between two statutory provisions for repayment of a creditor by a bankruptcy debtor: one provision (clause (ii)) allowing a sale of a property and repayment with the proceeds—but requiring the debtor to allow a creditor "credit-bid"—and a second catch-all provision (clause (iii)) allowing repayment with the "indubitable equivalent" of the value of the creditor property. The Supreme Court precluded a mechanism equivalent to the first provision but without the "credit-bid" option using the second provision because otherwise the general provision would swallow up the specific one. This case too cannot apply to the instant situation—the FBI's exclusion from § 2302(b) was not directed to the availability of an affirmative defense for a preference eligible with independent Board appeal rights, and the FBI is not excluded in § 7701(c)(2)(B). As such, the allowance of the whistleblower defense to the FBI here under § 7701(c)(2)(C)

would not swallow up the specific provision. The remainder of the cited cases are similarly inapposite.

Our decision is bolstered by consideration of 5 U.S.C. §§ 1214 and 1221. *See* 5 U.S.C. § 2303(c) ("The President shall provide for the enforcement of this section in a manner consistent with applicable provisions of sections 1214 and 1221 of this title."). Those sections allow employees with "the right to appeal directly to the Merit Systems Protection Board under any law, rule, or regulation" to seek corrective action for prohibited personnel action first to the Board, whereas other employees must first seek corrective action from Special Counsel. *See* 5 U.S.C. §§ 1221(a), (b), and 1213(a)(3).

We therefore reverse the Board's decision prohibiting Parkinson from raising the affirmative defense of Whistleblower retaliation under 5 U.S.C. § 2303.

### 2. USERRA Violation Affirmative Defense

Similarly, Parkinson argues that his removal would be not in accord with law under § 7701(c)(2)(C) if it is brought in violation of USERRA. In contrast to the whistleblower retaliation defense, however, the USERRA violation claims do manifest a clear Congressional will to withhold all judicial review of USERRA violations for FBI agents.

Parkinson does not explain the specific USERRA violation herein, and cites only 38 U.S.C. § 4315. That section, titled "Reemployment By Certain Federal Agencies" provides, *inter alia*, as follows:

(a) The head of each agency referred to in section 2302(a)(2)(C)(ii) of title 5 [including the FBI] shall prescribe procedures for ensuring that the rights under this chapter apply to the employees of such agency.

(b) In prescribing procedures under subsection (a), the head of an agency referred to in that subsection shall ensure, to the maximum extent practicable, that the procedures of the agency for reemploying persons who serve in the uniformed services provide for the reemployment of such persons in the agency in a manner similar to the manner of reemployment described in section 4313.

Section 4315 goes on to wholly exclude the FBI's determination of reemployability under that section from judicial review as follows:

(c) (1) The procedures prescribed under subsection (a) shall designate an official at the agency who shall determine whether or not the reemployment of a person referred to in subsection (b) by the agency is impossible or unreasonable.

(2) Upon making a determination that the reemployment by the agency of a person referred to in subsection (b) is impossible or unreasonable, the official referred to in paragraph (1) shall notify the person and the Director of the Office of Personnel Management of such determination.

*(3) A determination pursuant to this subsection shall not be subject to judicial review.*

(emphasis added). Unlike 5 U.S.C. § 2303(a), which sets forth a procedure for the internal resolution of whistleblower rights, 38 U.S.C. § 4315 explicitly indicates that the substantive determination of reemployability "shall not be subject to judicial review." Although such a prohibition applies by its terms only for "a determination pursuant to this subsection," i.e., pursuant to internal agency procedures, the Congressional intent to insulate the substantive determination from judicial review would be frustrated by allowance of judicial review under 5

U.S.C. § 7701(c)(2). *Cf. Dew v. United States*, 192 F.3d 366, 371–72 (2d Cir. 1999) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)) ("Whether and to what extent a particular statute [provides or] precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.'"). We note also that unlike the whistleblower act, which protects both veteran and non-veteran employees, USERRA by its terms applies only to veterans. *See* 38 U.S.C. § 4303 (defining "service in the uniformed services") and 38 U.S.C. §§ 4311–4312 (prohibiting certain acts against those who "serve in the uniformed services"). As such, it makes little sense to allow Parkinson—by virtue of his having served in the military service—access to judicial review over an affirmative defense grounded in a USERRA violation, when claims by others who have served are explicitly insulated from judicial review.

Congress's coupling of a specific procedure for enforcing USERRA reemployment violations at the FBI and similar agencies, coupled with an affirmative prohibition on judicial review of the substantive determination made thereby, leads us to conclude that Congress intended to exclude the substantive determination from judicial review of any kind, including when presented in the context of an affirmative defense under 5 U.S.C. § 7701(c)(2).

## E. Remand

In light of our disposition reversing the lack of candor determination, lifting the Board's prohibition of Parkinson's whistleblower retaliation defense, and sustaining the obstruction charge and the Board's prohibition of Parkinson's USERRA defense, we vacate the Board's affirmance of Parkinson's removal and remand. On remand, the only matters remaining for consideration are

the obstruction charge, Parkinson's whistleblower-reprisal defense thereto and the appropriate penalty, if any, after such consideration.

We note that the penalty determination section of the FBI's dismissal letter relating to the obstruction charge states:

> The investigation also established you violated FBI Offense Code 2.11 (OPR Matter – Obstruction). The standard penalty for this offense is a ten-day suspension. Mitigating factors warrant a three- to seven-day suspension. Aggravating factors warrant a fifteen-day suspension to dismissal.
>
> Your misconduct was repeated. You not only had Person # 1 [Rodda, it seems] sign a document, prepared by you, setting out the facts concerning a check for $1,215.67 written directly to you, but also contacted SA # 2, after the OIG investigation had begun, and questioned her regarding her recollection of witnessing the paying of a laborer in cash, prior to her interview. Based on the circumstances of this case, I would normally impose a 30-day suspension for your 2.11 offense, aggravated due to the multiple occurrences of attempting to influence witness statements. However, since I am dismissing you for your 4.5, 5.22, and 2.6 offenses, I am not imposing a separate sanction for your 2.11 offense.

J.A. 114–15. We note also the AJ's observation at J.A. 16 that "[t]his was not an especially egregious case of obstruction. The agency did not prove that the written statement [Parkinson] drafted for the landlord was incorrect or that he asked the landlord to lie about anything. Tr. 105, 116. The agency's proposal suggested that this was the least serious of the charges, and that on its

own it would have merited only a suspension rather than removal."

From the foregoing, it should be appreciated by the Board on remand that the penalty of removal, which was predicated on the now overturned lack of candor charge, cannot be sustained. Moreover, this court and the Board have made clear that, when "the Board sustains fewer than all of the agency's charges," the Board must defer to the agency's clear statement in "its final decision . . . that it desires a lesser penalty [than the maximum reasonable penalty] be imposed on fewer charges." J.A. 49 (Board decision in this case) (*citing Lachance v. Devall*, 178 F.3d 1246, 1260 (Fed. Cir. 1999)). Accordingly, the maximum penalty that can be sustained by the Board for the sole charge remaining in this case is a suspension of up to 30 days. Whether and to what extent the FBI, in the Board proceedings, has established more than the single instance of obstruction noted in the AJ's opinion at J.A. 14–16 and the Board's opinion at J.A. 38–40, or any other basis to warrant greater than a 10-day suspension for the obstruction charge is a question to be determined by the Board on remand.

## CONCLUSION

For the foregoing reasons, the Board's decision relating to the lack of candor charge is reversed, its decision relating to the obstruction charge is vacated and the case is remanded for further proceedings consistent with this opinion.

### REVERSED-IN-PART, VACATED-IN-PART AND REMANDED

## COSTS

Each party shall bear its own costs.

# United States Court of Appeals for the Federal Circuit

---

**JOHN C. PARKINSON,**
*Petitioner*

**v.**

**DEPARTMENT OF JUSTICE,**
*Respondent*

---

2015-3066

---

Petition for review of the Merit Systems Protection Board in No. SF-0752-13-0032-I-2.

---

TARANTO, *Circuit Judge*, dissenting in part.

I join the court's opinion except for the analysis of whistleblower reprisal, centered on Part II.D.1. In that portion of its opinion, the court holds that the Merit Systems Protection Board, in exercising its undisputed authority to review Mr. Parkinson's removal from his FBI position, *see* 5 U.S.C. §§ 7512, 7701, must adjudicate in particular Mr. Parkinson's claim that the removal constituted whistleblower reprisal in violation of 5 U.S.C. § 2303. I would hold, in agreement with the Board, that the Board may not decide that issue in deciding Mr. Parkinson's challenge to his removal.

It is plain under the statute that the prohibitions on whistleblower reprisal codified in 5 U.S.C. § 2302(b)(8) do not apply to the FBI: Congress expressly carved the FBI

out of the definition of "agency" governing § 2302(b)'s coverage. 5 U.S.C. § 2302(a)(2)(A), (C). The FBI's reprisal against an employee for whistleblowing is addressed by a separate provision, § 2303, which provides more limited protection than § 2302(b)—protecting from reprisal only whistleblower disclosures made "to the Attorney General" (or her designee), not disclosures made to outsiders. § 2303(a). With § 2302(b)(8) inapplicable, Mr. Parkinson's whistleblower-reprisal contention is necessarily a contention that the FBI violated § 2303, as Mr. Parkinson made explicit in his Petition for Review to the Board. J.A. 964.

To seek relief from the Board based on § 2303—for what is undisputedly an adverse action (removal) within the Board's review authority, 5 U.S.C. § 7512—Mr. Parkinson invokes 5 U.S.C. § 7701(c)(2). In relevant part, that provision instructs the Board that "the agency's decision may not be sustained if the employee or applicant for employment . . . (B) shows that the decision was based on any prohibited personnel practice described in section 2302(b) of this title; or (C) shows that the decision was not in accordance with law." Mr. Parkinson cannot invoke (B), but he invokes (C). He argues that the FBI's removal of him was a whistleblower reprisal forbidden by § 2303, hence "not in accordance with law," requiring that his removal be set aside.

I would reject the contention that § 2303 violations come within the "not in accordance with law" directive to the Board. I would read § 2303 as sufficiently embodying a determination by Congress, the President, and the Attorney General that § 2303 claims of FBI reprisal for whistleblower disclosures made to the Attorney General (the only disclosures protected by § 2303) are outside the Board's jurisdiction and within the full and final control of the Attorney General. No provision so states expressly. But the limit on Board review of § 2303 issues seems to me a clear enough implication of the congressional and executive decisions that I would find § 7701(c)(2)(C)

inapplicable under the principle that a sufficiently specific remedial regime can displace an otherwise-available general remedy whose application would impair policies evident in the specific remedial provisions. *See, e.g., United States v. Bormes*, 133 S. Ct. 12, 18 (2012); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012); *Hinck v. United States*, 550 U.S. 501, 507–08 (2007); *EC Term of Years Trust v. United States*, 550 U.S. 429, 433–34 (2007); *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 285 (1983); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 831–33 (1976).

When Congress enacted the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (1978), it defined a series of "prohibited personnel practices" in § 2302, which included, in § 2302(b)(8), a bar on whistleblower reprisal. *See* 92 Stat. at 1115–16. But Congress expressly made that provision inapplicable to the FBI. 92 Stat. at 1115. It enacted a separate section, § 2303, to protect against some whistleblower reprisals by the FBI. In subsection (a), Congress stated a limited reprisal rule to govern the FBI, protecting only disclosures made to the Attorney General or her designee, not disclosures made to anyone else. 92 Stat. at 1117–18. In subsection (b), Congress provided that the Attorney General should promulgate regulations to ensure compliance with the reprisal bar. And in subsection (c), Congress declared that "[t]he President shall provide for the enforcement of this section in a manner consistent with the provisions of section 1206 of this title." 92 Stat. at 1117–18.

The referred-to section 1206 was the 1978 Act's provision defining the authority and duty of the Board's Special Counsel to investigate prohibited personnel practices. *See* 92 Stat. at 1125–30. Neither that provision nor others provided employees a general right to seek Board review of whistleblower reprisal. But 5 U.S.C. § 7701(c)(2) was part of the 1978 Act, *see* 92 Stat. at 1138,

and that provision authorized the Board to hear (and the Board did hear) whistleblower-reprisal and other prohibited-personnel-action challenges asserted by employees who had been subjected to otherwise-appealable adverse actions such as removals, with the Board's decisions then subject to judicial review. *See Knollenberg v. MSPB*, 953 F.2d 623, 625 (Fed. Cir. 1992); *Hagmeyer v. Dep't of Treasury*, 757 F.2d 1281, 1283–84 (Fed. Cir. 1985); *Sullivan v. Dep't of Navy*, 720 F.2d 1266, 1275 (Fed. Cir. 1983).

In particular, as already noted, Congress separately directed the Board not to sustain an agency decision within its reviewing authority if the challenger "(B) shows that the decision was based on any prohibited personnel practice described in section 2302(b)" or "(C) shows that the decision was not in accordance with law." 5 U.S.C. § 7701(c)(2). It is conspicuous that Congress, having carved the FBI out of § 2302(b) and adopted § 2303 as a limited FBI-specific counterpart, chose not to include § 2303 in the provision of § 7701(c)(2) specifically addressing prohibited personnel practices, despite the overlap of whistleblower-reprisal subject matter. That omission on its face tends to suggest that Congress was excluding FBI whistleblower reprisal from Board review, notwithstanding the catchall "not in accordance with law" language.

In 1989, Congress enacted the Whistleblower Protection Act of 1989, Pub. L. No. 101-12, 103 Stat. 16 (1989). That Act strengthened the general whistleblower protections of § 2302(b)(8). Among other things, the 1989 Act created a new Office of Special Counsel (OSC) with various powers, *see* 5 U.S.C. §§ 1211–19; 103 Stat. at 19–29, and it also specifically provided a new Individual Right of Action, *see* 5 U.S.C. §§ 1214(a)(3), 1221, by which an employee, applicant, or former employee may bring to the Board whistleblower claims covered by § 2302(b)(8), *see* 103 Stat. at 24, 29–31. Those provisions replaced the former 5 U.S.C. § 1206, which now provides for certain annual reports. *See* 103 Stat. at 18–19. The 1989 Act

made only one change in the limited FBI-specific whistle-blower-reprisal provision, § 2303. It changed subsection (c)'s reference to "the provisions of section 1206" so that the provision now directs the President to provide for enforcement in a manner consistent with "applicable provisions of sections 1214 and 1221." *See* 103 Stat. at 34.

In 1997, the President formally delegated to the Attorney General his responsibilities under § 2303(c) to establish means for enforcing the limited reprisal protection of § 2303(a). Memorandum, Delegation of Responsibilities Concerning FBI Employees Under the Civil Service Reform Act of 1978, 62 Fed. Reg. 23,123 (Apr. 14, 1997). The President directed the Attorney General "to establish appropriate processes *within* the Department of Justice to carry out these functions." *Id.* (emphasis added).

The Attorney General, after adopting an interim rule in 1998, adopted a final rule to govern § 2303 in November 1999. 64 Fed. Reg. 58,782, 58,786–88 (Nov. 1, 1999) (adopting 28 C.F.R. §§ 27.1–27.6). Like the interim rule, the final rule establishes the Office of Professional Responsibility (OPR) and the Office of Inspector General (OIG) as investigative authorities (each labeled a "Conducting Office"), and it designates the Director of the Office of Attorney Personnel Management (Director) to "decide whistleblower reprisal claims presented to her by OPR or OIG." *Id.* at 58,783. The Attorney General explained that "the roles and functions of the Conducting Office and the Director are thus analogous to those of the OSC and MSPB, respectively, in whistleblower cases involving federal employees generally." *Id.*

She then explained a crucial difference—the retention of internal Department control of § 2303 matters. "One fundamental difference, however, between the two systems is that the procedures provided in the interim rule [not changed in the final rule in this respect] are entirely

internal to the Department." *Id.* She cited in support of that determination (a) the fact that the only protected disclosures are certain disclosures within the Department, (b) the President's 1997 directive to establish processes *within* the Department, and (c) legislative history to the effect that "'appeals would not be to the outside but to the Attorney General.'" *Id.* (quoting 124 Cong. Rec. 28,770 (1978) (pre-Conference statement of Representative Udall, who came to chair the Conference Committee on the Civil Service Reform Act in 1978). The Attorney General reiterated the point in rejecting a comment suggesting that the statute required "entities external to and independent of the Department" to carry out the § 2303 roles. *Id.* at 57,785. "If Congress had wanted to provide FBI employees with fora outside the Department to address their whistleblower reprisal claims, it could have included them in the OSC/MSPB scheme. The fact that Congress did not do so, *see* 5 U.S.C. 2302(a)(2)(C)(ii), strongly suggests that Congress, in enacting section 2303, did not envision the creation of external entities to perform the OSC/MSPB functions." 64 Fed. Reg. at 58,785–86.

Rounding out the relevant legal materials is what the Conference Committee said in explaining the conference bill that was adopted as the Civil Service Reform Act in 1978. The Conference Committee explained:

> The conference substitute excludes the FBI from coverage of the prohibited personnel practices, except that matters pertaining to protection against reprisals for disclosure of certain information described in section 2302(b)(8) would be processed under special procedures similar to those provided in the House bill. The President, rather than the Special Counsel and the Merit Board, would have responsibility for enforcing this provision with respect to the FBI under section 2303.

S. Rep. No. 95-1272, at 128 (1978). The Conference Committee's language is not limited to the special § 1206 enforcement route. The 1978 Act being addressed by the Conference Committee included 5 U.S.C. § 7701(c)(2)'s directive to the Board not to sustain removals and other adverse actions that were "not in accordance with law."

Based on the pertinent statutory provisions, their evolution, their legislative history, and the actions of the President and Attorney General under the delegated implementation authority, I would conclude that the Board is not to adjudicate claims that the FBI engaged in whistleblower reprisal proscribed by § 2303(a). To apply § 7701(c)(2)(C)'s general, catchall "not in accordance with law" provision would be to impair the determination—strongly suggested by the congressional actions and statements, and made explicit by the President and the Attorney General—that resolution of such issues should be confined to the Department of Justice, which is the only recipient of disclosures protected from reprisal in the first place. The statutory materials provide substantial support for that conclusion, and given the implementation-authority grants of § 2303(b) & (c), it seems to me that the determination to that effect by the President and the Attorney General, made after the 1989 amendments, is owed deference as a formal exercise of expressly delegated authority.

Because this is an issue-specific exclusion from Board authority, I do not see why it matters that Mr. Parkinson is eligible to bring his removal to the Board for adjudication of other challenges under 5 U.S.C. §§ 7512–7513, 7701. And I do not see why it should make a difference that Mr. Parkinson is raising the issue of whistleblower reprisal as an affirmative defense to his removal (he has the burden of persuasion), in a proceeding in which the FBI has the burden of affirmatively justifying the removal under 5 U.S.C. § 7701(c)(1)(B). That posture does not eliminate either a general concern about outside-the-

Department interference in FBI whistleblower-reprisal matters or a specific concern about the potential leaking of sensitive law-enforcement or intelligence information. *Van Lancker v. Dep't of Justice*, 119 M.S.P.R. 514, 519 (2013). The reasons for excluding the Board from ruling on the issue do not depend on the procedural posture before the Board.

For those reasons, I respectfully dissent from the holding that Mr. Parkinson may pursue his whistleblower-reprisal claim.